# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 98-2549

_____

United States of America,

             Appellee,

    v.

Billie Jerome Allen,

             Appellant.

_____

No. 98-2984

_____

United States of America,

             Appellee,

    v.

Norris G. Holder,

             Appellant.

Appeals from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted:  January 10, 2000
Filed: April 12, 2001 (corrected 5/7/01)

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and MELLOY,[1] District Judge.

_____

HANSEN, Circuit Judge.

On March 17, 1997, security guard Richard Heflin was killed during an armed robbery of the Lindell Bank & Trust in St. Louis (Forest Park), Missouri. Billie Jerome Allen and Norris G. Holder were charged and convicted in separate jury trials for violating 18 U.S.C. §§ 2, 2113(a) and (e) (1994) (armed robbery by force or violence in which a killing occurs) (Count I) and 18 U.S.C. §§ 2, 924(c)(1) and (j)(1) (1994 and Supp. II 1996) (carrying or using a firearm during a crime of violence and committing murder) (Count II). Allen was sentenced to life in prison on Count I and received a sentence of death on Count II. Holder received sentences of death for both Counts I and II. In these direct appeals, Allen and Holder raise numerous challenges to the constitutionality of the Federal Death Penalty Act of 1994, they allege that the district court[2] committed several errors during jury voir dire, trial, and sentencing, and they raise various other statutory and constitutional challenges to their convictions and sentences. For the reasons discussed below, we affirm Allen's and Holder's convictions and sentences.

## I.  Background

Holder was a regular customer of the Lindell Bank & Trust. Five hundred dollars was automatically deposited to his account each month from a legal settlement Holder obtained after losing the lower portion of one leg in a train accident, and every

---

[1]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa, sitting by designation.

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

2

month Holder withdrew that five hundred dollars. On March 13, 1997, four days before the date of the armed robbery, Holder brought Allen along with him for his monthly withdrawal of funds. Allen and Holder were also seen together on several other occasions during the ten days leading up to the armed robbery. Together they watched the movies "Heat" and "Set It Off" which depicted assault-style takeover armed bank robberies similar in many details to the manner in which they later robbed the Lindell Bank & Trust. In preparation for the armed robbery, Holder supplied or obtained a Russian SKS semiautomatic assault rifle, a Chinese SKS semiautomatic assault rifle, a twelve-gauge shotgun, approximately two hundred rounds of ammunition consisting mostly of military style hollow point ammunition for the two SKS rifles, and a bulletproof vest which he wore. The night before the armed robbery two vans were stolen for use as the first two getaway vehicles after the robbery (Holder's mother's car was to be used as the third, and last, getaway vehicle).

On the day of the armed robbery, March 17, 1997, Allen and Holder parked the first getaway van on the street just outside the bank. Wearing dark ski masks and armed with the semiautomatic rifles--Allen with the Chinese SKS loaded with 11 rounds, and Holder with the Russian SKS loaded with 37 rounds and each carrying extra rounds of the hollow point ammunition--they rushed into the bank. The first man to enter immediately began firing shots at security guard Heflin, and during the course of the robbery Holder jumped over the tellers' counter and retrieved money from the tellers' drawers. The ballistics evidence showed that both rifles were discharged during the robbery and a total of sixteen shots were fired inside the bank, at least eight of which hit security guard Heflin who died shortly thereafter. Eleven of the shots came from the Chinese SKS rifle, three came from the Russian SKS rifle, and the remaining two could have come from either rifle. After the armed robbery, which lasted only a few minutes, Allen and Holder returned to the getaway van and sped off down the highway.

Several witnesses spotted the two men exiting the bank and returning to the van. Bank customer William Green, after hearing gunshots while at the drive-up teller window, dialed 911 and followed the van onto the highway. He continued following the van as it sped down the highway and into Forest Park. As the van entered the park, Green saw it burst into flames. Prior to the armed robbery, the suspects had soaked the van with gasoline so that it would be easier to destroy the evidence once they reached their second getaway vehicle. The van apparently started on fire when one of the suspects flicked a cigarette lighter. After the van started on fire, the van's passenger-- Allen--jumped out and ran into a wooded area. The other occupant, Holder, was on fire and two park workers helped to extinguish the flames. A police officer arrived on the scene simultaneously and arrested Holder.

Allen, meanwhile, was spotted soon after he left the van on the opposite side of the wooded area by city forestry employee Bobby Harris. After making up a story about why the hair on his head was burned, Allen convinced Harris and another forestry employee to give him a ride to the nearest Metrolink station. Harris later identified Allen in a lineup and at trial. Allen was arrested early the next morning at his girlfriend's apartment, the same apartment where he and Holder had stayed the night before the bank robbery and had together watched the movie "Set It Off."

## II. Analysis

Allen and Holder allege numerous constitutional, statutory, and procedural violations as grounds for relief from each of their respective convictions and sentences. We separately address each defendant's claims.

### A. Billie Jerome Allen

#### 1. Facial Constitutional Challenges

Allen raises a host of facial constitutional challenges, based on the Eighth Amendment and Article I of the Constitution, to the Federal Death Penalty Act of 1994 (hereinafter "FDPA"). See 18 U.S.C. §§ 3591-3598 (1994). We review claims of constitutional error and issues of statutory construction de novo. See Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir.), cert. denied, 519 U.S. 874 (1996).

##### a. Nonstatutory Aggravating Factors

Allen argues that the use of nonstatutory aggravating factors, which the FDPA explicitly allows,[3] fails to adequately limit and guide the sentencing discretion of the jury in violation of various Supreme Court decisions interpreting the Eighth Amendment. See, e.g., Lewis v. Jeffers, 497 U.S. 764, 774 (1990) (explaining that a sentencing body's discretion must be suitably directed and limited, by clear and objective standards that provide specific and detailed guidance, so as to minimize the risk of wholly arbitrary and capricious action and to make rationally reviewable the process for imposing a death sentence) (citing Godfrey v. Georgia, 446 U.S. 420, 428 (1980), and Gregg v. Georgia, 428 U.S. 153, 189 (1976)). We disagree with Allen's underlying premise that the purpose of the nonstatutory aggravating factors under the

---

[3]In addition to sixteen explicit statutory aggravating factors for homicide, the FDPA also allows the presentation to the jury of nonstatutory aggravating factors. See 18 U.S.C. § 3592 (c) (Supp. II 1996) ("The jury . . . may consider whether any other aggravating factor for which notice has been given exists.").

5

FDPA is to limit and guide a jury's discretion in determining who is eligible to receive a sentence of death. The statutorily defined aggravating circumstances are those which channel the sentencer's discretion because they are the circumstances which make a defendant eligible for the death penalty. See Lewis, 497 U.S. at 774.

The primary purpose of the nonstatutory aggravating factors, as opposed to the listed statutory aggravating factors which do fulfill the role of limiting and guiding a jury's discretion in making the eligibility decision, is to allow for the individualized determination of whether a death sentence is justified for a particular defendant; that is, they help to inform the selection decision. As the Supreme Court has explained,

> [o]ur capital punishment cases under the Eighth Amendment address two different aspects of the capital decision-making process: the eligibility decision and the selection decision. . . . To render a defendant eligible . . . the trier of fact must . . . find one 'aggravating circumstance' . . . . We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

Tuilaepa v. California, 512 U.S. 967, 971-72 (1994) (internal quotations omitted). The Supreme Court has also stated the following:

> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

<u>Zant v. Stephens</u>, 462 U.S. 862, 878 (1983). The framework of the FDPA passes constitutional muster because it does not allow imposition of the death penalty unless the jury first finds at least one <u>statutory</u> aggravating circumstance.

> The jury . . . shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. . . . If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death . . . .

18 U.S.C. § 3593(d). If no listed statutory aggravator is unanimously found by the jury, no sentence of death can be imposed. We therefore find no constitutional infirmity with the FDPA's permitting the prosecution to propose nonstatutory aggravating factors to fit the particular circumstances of a crime and to assist the jury in determining whether the death penalty should be imposed upon a defendant already determined to be eligible for that ultimate punishment.

Allen also argues that the FDPA impermissibly delegates legislative power to government prosecutors by allowing them the discretion to propose nonstatutory aggravating factors to a capital sentencing jury. Congress may not delegate its legislative power to another Branch, but it may seek assistance from another Branch so long as Congress legislates "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." <u>Mistretta v. United States</u>, 488 U.S. 361, 372 (1989) (upholding the United States Sentencing Guidelines). <u>See id.</u> at 390 (pointing out that the federal "sentencing function long has been a peculiarly shared responsibility" rather than "the exclusive constitutional province of any one Branch" and finding no unconstitutional delegation of legislative power). As the Fifth Circuit has pointed out, there are at least four limitations on a prosecutor's discretion with respect to nonstatutory aggravating factors. <u>See</u> <u>United States v. Jones</u>, 132 F.3d 232, 239-40 (5th Cir. 1998), <u>aff'd</u>, 527 U.S. 373 (1999). A jury must find the existence of at least one statutory aggravating factor before it can

even consider proposed nonstatutory factors, a prosecutor can only argue those nonstatutory aggravating factors for which the defendant has been given prior notice, a nonstatutory aggravating factor itself must conform with due process jurisprudence, and a district judge is required to screen out any irrelevant and unduly prejudicial information a prosecutor may try to introduce to the jury in order to prove a nonstatutory aggravating factor. Id. at 240. We agree with the Fifth Circuit that these limitations provide intelligible principles which constrain a prosecutor's discretion such that the delegation is not unconstitutional. United States v. Paul, 217 F.3d 989, 1003 (8th Cir. 2000) (holding that "the prosecutor's authority to define nonstatutory aggravating factors is a constitutional delegation of Congress's legislative power"); See also United States v. Tipton, 90 F.3d 861, 895 (4th Cir. 1996)(holding that any delegation of legislative authority was permissible, without deciding whether there was in fact any delegation), cert. denied, 520 U.S. 1253 (1997); United States v. McCullah, 76 F.3d 1087, 1106-07 (10th Cir. 1996), cert. denied, 520 U.S. 1213 (1997).

Finally, Allen argues that the FDPA's allowance of nonstatutory aggravating factors violates the constitutional prohibition against ex post facto laws.[4] We reject Allen's argument, however, because the statutes under which he was convicted make clear that a sentence of death is authorized, and nonstatutory aggravating factors are not used to determine eligibility for the death penalty. Thus, proposing nonstatutory aggravating factors to the jury does not in any way alter the definition of the underlying crime for which Allen was convicted, nor does it increase the punishment to which Allen is subjected.[5] See Walton v. Arizona, 497 U.S. 639, 648 (1990)(finding that

---

[4]See U.S. Const. art. I, § 9, cl. 3 ("No . . . ex post facto Law shall be passed.").

[5]Although the Supreme Court's recent decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), may call into question whether statutory aggravating factors, which are designed to meet the Supreme Court's requirement under the Eighth Amendment to narrow the class of death-eligible defendants, should be considered "increases in punishment," we do not think that nonstatutory aggravating factors under the FDPA can

aggravating circumstances are not separate penalties or offenses); <u>Lewis</u>, 497 U.S. at 782 (1990) (finding that aggravating circumstances are not elements of any offense).

### b.  Use of "Information"

Allen argues that because the FDPA allows the introduction during the sentencing phase of "information" rather than only "evidence," a jury's sentencing decision under the FDPA is inherently unreliable in violation of the Eighth Amendment. We reject this claim.  The FDPA allows either party to introduce any "information" relevant to an aggravating or mitigating factor, regardless of its admissibility under the federal rules of evidence, but provides that the information "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Thus, not only does the statute protect a defendant from both irrelevant information and overly prejudicial information, the relaxed evidentiary standard also works to a defendant's advantage in helping to prove mitigating factors and to disprove aggravating factors.  Allen's reliance on <u>California v. Brown</u>, 479 U.S. 538, 542-43 (1987), which used the term "evidence" rather than "information" in its opinion, is misplaced because the distinction between evidence and information was not at issue.  We therefore reject Allen's facial challenge to the FDPA's relaxed evidentiary standard during sentencing.  <u>See</u> <u>Gregg</u>, 428 U.S. at 204 ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.");  <u>Jones</u>, 132 F.3d at 242 (holding that "the [FDPA's] relaxed evidentiary standard does not impair the reliability or relevance of information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the [C]onstitution").

### c.  Appellate Review

---

ever be viewed as subjecting a defendant to increased punishment because they only come into play during the jury's selection, as opposed to its eligibility, determination.

Allen claims that the FDPA is unconstitutional because it lacks proportionality review. Allen argues that the Supreme Court's decision in Gregg mandates proportionality review whenever a death penalty statute allows the consideration of nonstatutory aggravating factors in the final sentencing decision. We disagree with Allen's reading of the Supreme Court's holding in Gregg. See Pulley v. Harris, 465 U.S. 37, 50-51 (1984) (holding that although proportionality review is an additional safeguard against arbitrarily imposed death sentences, neither precedent [including Gregg] nor the Eighth Amendment mandates proportionality review in every case). As the Supreme Court held in McCleskey v. Kemp, "[w]here the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." 481 U.S. 279, 306 (1987). We hold that the FDPA has sufficient safeguards--notably the requirements that a jury find beyond a reasonable doubt the existence of one statutory aggravating factor and at least one of four requisite levels of specific intent on the part of a defendant, not to mention various other procedural protections[6]--such that proportionality review is not required in order for the FDPA to pass constitutional muster.

We also reject Allen's argument that the absence of mandatory, automatic appellate review somehow violates the Eighth Amendment because it is incompatible with the evolving standards of decency of a maturing society. Even if this challenge to the FDPA is a valid argument under the Eighth Amendment, which we highly doubt,

---

[6]See, e.g., 18 U.S.C. § 3595(c)(1) ("The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592."); § 3593(f) (requiring each juror, if the death penalty is imposed, to sign a statement saying that consideration of "race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision").

Allen lacks standing to raise this challenge because he has taken advantage of appellate review and thus can show no actual harm in the FDPA's requirement that a defendant must initiate appellate review.

### d. Scope of FDPA

Allen argues that the "remarkable breadth" of the FDPA fails to narrow genuinely the class of persons eligible for execution and fails to channel adequately a sentencing jury's discretion.  See Zant, 462 U.S. at 877.  We agree with the Fifth Circuit that, under the Constitution, the FDPA adequately narrows the class of persons eligible for the death penalty and sufficiently channels a jury's sentencing discretion.  See Jones 132 F.3d at 248-49 (finding that the FDPA narrows a jury's sentencing discretion by first requiring that a defendant had the requisite intent and second that at least one statutory aggravating factor is present).  Moreover, the FDPA limits the class of persons eligible for the death penalty even before the jury considers intent and aggravating circumstances by authorizing the death penalty only for certain federal crimes.  In short, how broadly or how narrowly the death penalty should be applied as punishment, if at all, is essentially a political choice left to the people's elected representatives in the legislative and executive branches, and we find none of the Eighth Amendment's limitations on that legislative choice facially applicable to the FDPA.  See, e.g., Coker v. Georgia, 433 U.S. 584, 592 (1977) (ruling that the death penalty for rape is grossly disproportionate and excessive and thus cruel and unusual punishment); Enmund v. Florida, 458 U.S. 782, 788 (1982) (prohibiting the death penalty where it is greatly disproportionate to a defendant's culpability).  We therefore reject Allen's argument that the FDPA authorizes a sentence of death for too many federal crimes.  In particular, with respect to this case, murder is a crime for which the death penalty has long been deemed appropriate.

### 2. Fifth Amendment Challenges
### a. Indictment Clause

11

The FDPA requires the government to file with the court, and to serve on the defendant, a notice of intent to seek the death penalty "a reasonable time before the trial or before acceptance by the court of a plea of guilty."  18 U.S.C. § 3593(a).  This notice of intent must include a statement that the government believes the circumstances of the case justify imposing a sentence of death and that if the jury finds the defendant guilty the government will seek a sentence of death.  Id.  The notice must also set forth any aggravating factors the government intends to use as justification for a sentence of death.  Id.  There is no allegation that the government's properly and timely filed notice of intent in this case has failed to meet the FDPA's statutory notice requirements.  Instead, Allen directly challenges the adequacy of the FDPA under the Constitution.

Allen specifically argues that his sentence was imposed in violation of the Fifth Amendment's Indictment Clause[7] because the FDPA fails to require that the decision to seek the death penalty, just like the decision to charge a defendant with a federal offense, be routed through the Grand Jury.  Allen also argues that the government's failure to allege in his indictment both the mental culpability factor from § 3591(a) and the aggravating factors from § 3592(c) upon which it relied during sentencing as the justification for imposing a death sentence constitutes constitutional error in light of the Supreme Court's recent rulings in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), and Jones v. United States, 526 U.S. 227 (2000).  We respectfully disagree.

First, we reject Allen's argument that his case did not become a capital case (as referred to in the Fifth Amendment) until the notice of intent was actually filed.  We hold that the original indictment returned by the Grand Jury sufficiently alleged a capital offense against Allen upon which he could be tried and, if convicted, could be

_____

[7]See U.S. Const., amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .").

12

sentenced to death. The penalties listed for the offenses in the indictment against Allen are "death or life imprisonment" for Count I and "death or by imprisonment for any term of years or for life" for Count II. See 18 U.S.C. § 2113(e) (1994) and 18 U.S.C. § 924(j) (Supp. II 1996), respectively. Allen's attempted reliance on Stirone v. United States, 361 U.S. 212, 217 (1960), which held that once an indictment is returned, charges may not be broadened later except through the Grand Jury, is misplaced. The reasoning of Stirone is not implicated and does not control the outcome of this case because the original indictment sufficiently charged an offense which expressly subjects a convicted defendant to a maximum punishment of death. Because both § 2113(e) and § 924(j) specifically authorize the death penalty as punishment for any defendant found guilty of the listed offense, the Fifth Amendment's Indictment Clause is satisfied.

Congress is free to pass, and may even be required to pass under the Eighth Amendment, additional protections for a capital defendant prior to the actual imposition of a death sentence, as it did by requiring notice of intent to seek the death penalty along with notice of any proposed aggravating factors a reasonable time before trial. But these protections do not increase the maximum sentence set forth in each of the statutes for the specific offenses alleged in the indictment and thus do not amount to separate elements that must be alleged in the indictment. See Apprendi, 120 S. Ct. at 2362-63; Jones, 526 U.S. at 251. In short, even if Allen is correct that under the FDPA and the Eighth Amendment the charged offenses could not be prosecuted as capital crimes until the notice was filed along with the proposed aggravating factors, we conclude that the original indictment nevertheless sufficiently alleged a capital crime as required by the Fifth Amendment's Indictment Clause.

For similar reasons, we also reject Allen's contention that aggravating factors and mental culpability factors must be alleged in an indictment in order to satisfy the Fifth Amendment. A defendant is entitled to "'a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" Apprendi, 120 S. Ct. at 2356 (quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)). Also,

13

"under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones, 526 U.S. at 243 n.6. We note initially that the Sixth Amendment's right to trial by jury and the Fifth Amendment's due process requirement of proof beyond a reasonable doubt have been satisfied as to the mental culpability factors and the aggravating factors at issue here. We need only examine whether the Fifth Amendment's indictment requirements have been met.

We begin by determining whether the mental culpability factors and statutory aggravating factors are elements of the underlying offense, because as already noted, every element of an offense must be charged in an indictment to satisfy the Fifth Amendment. The structure of the two statutes indicates that neither factor is an element of the offense of conviction. The two factors are listed in entirely different sections of the United States Code. Compare 18 U.S.C. §§ 2113(e) and 924(j) (setting forth the underlying criminal offenses) with 18 U.S.C. §§ 3591(a) and 3592(c) (setting forth the FDPA's sentencing procedures and requirements). Thus, it is clear from the plain language of the various statutes that Congress did not make the mental culpability factors or the statutory aggravating factors elements of the underlying offense.

The next question, then, is whether the mental culpability factors and statutory aggravating factors are deemed elements of the crime by virtue of being facts which are the basis for increasing the maximum punishment. See Apprendi, 120 S. Ct. at 2362-63 (holding that any fact, other than fact of prior convictions, which increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proven beyond a reasonable doubt); id. at 2368 (explaining that "every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)" is an element of the crime or aggravated crime) (Thomas and Scalia, JJ., concurring). We think that when read in the context of the Supreme Court's decisions

14

interpreting the Eighth Amendment in death cases over the past two decades, these two features of the FDPA are properly characterized as sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence. The underlying crimes of conviction expose a convicted defendant to either death or a life sentence. In each case, death is the first punishment authorized by each statute. Under the FDPA, if a jury cannot agree unanimously beyond a reasonable doubt that a convicted defendant acted with one of the four listed mental culpability states, then a defendant's maximum sentence is limited to life in prison. Similarly, if the jury cannot agree unanimously beyond a reasonable doubt that the convicted defendant's actions fit the definition of at least one of the listed statutory aggravating factors, then a defendant's sentence is limited to life in prison. Finally, if the jury cannot agree unanimously that the aggravating factors sufficiently outweigh the mitigating factors such that a sentence of death is justified, then the defendant's sentence is limited to life in prison.

Allen argues that each of the above jury determinations should be viewed as elements that increase the maximum penalty by assuming that a life sentence is the initial baseline from which the jury's sentencing determinations under the FDPA are viewed. We reject this interpretation because the statutes at issue expressly authorize a maximum penalty of death and the sentencing factors of mental culpability and aggravating circumstances do not increase the sentencing range but rather provide the particularized standards for choosing which of the alternative available sentences should be imposed. Making a defendant automatically eligible for the death penalty absent these types of protective requirements is prohibited by Eighth Amendment jurisprudence. See Apprendi, 120 S. Ct. at 2380 (noting that a legislature may not provide by statute that a person is death eligible automatically upon conviction because in the area of capital punishment, the Court has "imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment--we have restricted the legislature's ability to define crimes") (Thomas and Scalia, JJ., concurring). The fact-finding barrier that exists between a jury verdict that a defendant

15

is guilty of a capital crime for which one punishment is known to be death and a court's ability to impose that capital punishment, id., acts to protect the defendant from an automatic death sentence. Because of the unique context of this scheme, and because the statutes of conviction authorize a penalty of death, we hold that failure to allege the mental culpability and statutory aggravating factors in a capital defendant's original indictment does not violate the Fifth Amendment's Indictment Clause. See Walton, 497 U.S. at 648 (explaining that aggravating circumstances are not separate penalties or offenses but rather are "'standards to guide the making of the choice between the alternative verdicts of death and life imprisonment'") (quoting Poland v. Arizona, 476 U.S. 147, 156 (1986)).

b. Refusal To Suppress Confession

Allen argues that the district court erred in refusing to suppress the confession he gave to police on the morning of his arrest. Allen's primary assertion is that officers made no effort to comply with his request for counsel, and thus any statements made to the police after his request, including his confession, should have been suppressed because they were coerced in violation of the Fifth Amendment.[8] The government counters that Allen's admission was voluntarily made after a knowing and intelligent waiver of his Fifth Amendment rights. We first briefly recite the facts surrounding Allen's arrest, interrogation, and confession, based on the magistrate judge's findings which were adopted by the district court. (See Allen App., Vol. I at 114-80, 192-93.)

Allen was arrested at approximately 2:00 a.m. on the morning following the day of the bank robbery and was read his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 479 (1966). Around 3:00 a.m. Allen was placed in an interrogation room, handcuffed to the table, advised again of his Miranda rights, and treated for his burns and injuries. Sometime between 3:00 a.m. and 4:00 a.m., an FBI agent began

---

[8]See U.S. Const., amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . .").

16

questioning Allen after advising him, for the third time that morning, of his <u>Miranda</u> rights. Allen agreed to provide blood, hair, and saliva samples and then asked for counsel to be appointed to assist him. At that point, the questioning immediately ended. Allen was offered food and drink, which he declined, and officers fulfilled Allen's request for a towel for his eyes and that the lights be turned off. At approximately 8:00 a.m., a detective reminded Allen of his agreement earlier that morning to provide the blood, hair, and saliva samples, and asked Allen if, in light of his request for counsel, he still wished to provide the samples. Allen agreed to provide the samples and verified his decision in writing. Around 10:00 a.m., a detective asked Allen if he was willing to appear in a lineup. After being informed of his right to have counsel present at the lineup, Allen agreed to appear in the lineup without the presence of counsel. After the lineup was finished, detectives informed Allen of the results of the lineup--that three out of four eyewitnesses placed him at the scene of the crime the previous day--at which point Allen asked to speak with Lieutenant Henderson, an officer Allen knew from an earlier case. Prior to confessing to Henderson, Allen was reminded of his earlier request for counsel and again advised of his <u>Miranda</u> rights. Allen stated that he understood his right to counsel and that he wanted to talk to Henderson without counsel present. Allen then set up the ground rules for the discussion, including no written or signed statements and no video or tape recording, and then confessed to participating in the previous day's armed bank robbery.

On appeal, Allen does not challenge the district court's factual findings but rather the legal conclusion to be drawn from the facts, which we review de novo. <u>See</u> <u>United States v. Looking</u>, 156 F.3d 803, 809 (8th Cir. 1998). There is no doubt that Allen asserted his right to counsel shortly after custodial interrogation began and that counsel was not present at the time of his confession. Thus, we must decide whether Allen validly waived his previously invoked right to counsel.

Waivers of counsel must be voluntary and must constitute a knowing and intelligent relinquishment of a known right. <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477,

482 (1981). This requires consideration of the particular facts and circumstances surrounding each case. Id. Under the Fifth Amendment, once an individual expresses a desire to deal with the police through counsel, the authorities may not subject him to further interrogation until counsel has been made available to him, unless the accused validly waives his right by initiating further communication with the police. Id. at 484-85. Interrogation includes express questioning or its functional equivalent, and the Supreme Court has further defined functional equivalent as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Determining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given. See United States v. Payne, 954 F.2d 199, 202-03 (4th Cir.), cert. denied, 503 U.S. 988 (1992). See also United States v. Jackson, 189 F.3d 502, 510-11 (7th Cir.), cert. denied, 528 U.S. 979 (1999).

We turn now to the particular circumstances surrounding Allen's request for counsel, alleged waiver, and confession. First, although Allen had earlier invoked his right to counsel, we hold that informing Allen of the results of the lineup did not amount to the functional equivalent of interrogation for purposes of the Fifth Amendment. It was a simple description of the status of the ongoing investigation which, according to the government, is a routine practice for suspects in custody in this particular jurisdiction. More importantly, it was not designed to, nor was it reasonably likely to, elicit an incriminating response from Allen. This was a statement of fact and not a plea to conscience. See Innis, 446 U.S. at 294-95, 302-03. Rather, the officer simply described the results of the lineup, unaccompanied by any threats or other compelling pressure. See Payne, 954 F.2d at 202 (stating that "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation"). Informing a suspect

18

that he has been identified in a lineup contributes to the intelligent exercise of his judgment and may likely make firm his resolve to refuse to talk to the police without counsel. Id. Moreover, keeping a suspect informed of the progress of the investigation and the status of the charges against him should be encouraged rather than discouraged, so long as the communication is truthful, and is not designed, nor is it likely to elicit, an incriminating response. On these facts, therefore, we conclude that the officer's statement to Allen explaining the results of the lineup did not constitute interrogation.

After resolving the interrogation issue, we have little difficulty determining that Allen's subsequent self-initiated request to speak to Lieutenant Henderson amounted to a valid waiver of his right to counsel. Allen clearly initiated the request to speak with Lieutenant Henderson and knew full well his right to counsel and the consequences of foregoing that right. He had been informed of his right on prior, unrelated occasions and had indicated that he understood them. In addition to being given Miranda warnings four times earlier that morning and actually invoking his right to counsel after one of the warnings (which is strong evidence that Allen understood his rights), Allen was reminded of his request for counsel and given another explanation of his Fifth Amendment rights just prior to his confession. Moreover, Allen even set up the ground rules for his confession. We therefore conclude that Allen's waiver of his right to counsel was valid because it was knowing and intelligent, voluntarily given, and initiated by Allen, and therefore the district court did not err in denying Allen's motion to suppress the confession. See Holman v. Kemna, 212 F.3d 413, 418-21 (8th Cir.) (holding ultimately that there was no Edwards violation and that the waiver of counsel was valid because Holman did not confess until the next day and the totality of the circumstances showed that the confession was voluntary and knowing and intelligent), cert. denied, 121 S. Ct. 587 (2000). See also United States v. Williams, 136 F.3d 547, 552-53 (8th Cir. 1998) (holding admissible suspect's statement to police after being informed that he had been identified in a lineup, which the court assumed without deciding was interrogation for purposes of the appeal, because the statements

19

were voluntarily made without any coercion and came after the suspect was given and validly waived his <u>Miranda</u> rights), <u>cert. denied</u>, 526 U.S. 1003 (1999).

Finally, the fact that officers did not find counsel for Allen immediately after his request does not automatically result in a violation of his right to counsel. The officers scrupulously honored his right to remain silent and his invocation of the right to counsel by not interrogating him after he invoked these rights until Allen volunteered his confession. <u>Miranda</u> condemns the use of psychological ploys and staged lineups as attempts to elicit a confession, but not all statements obtained by the police are the product of interrogations. <u>See</u> <u>Innis</u>, 446 U.S. at 299. The length of time that elapses between a request for counsel and when counsel is actually supplied is simply one factor among many to be considered when determining whether a suspect's waiver was voluntarily given, and we disagree with Allen that the approximately seven hours that elapsed between his request for counsel and his voluntary confession, when viewed in light of all the facts that took place early that morning, resulted in an involuntary or improperly coerced confession under the Fifth Amendment. <u>See</u> <u>United States v. McClinton</u>, 982 F.2d 278, 282 (8th Cir. 1992) (explaining that "[t]he appropriate test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will") (internal quotations and citations omitted).

### c. Double Jeopardy

Allen argues that his multiple sentences of life in prison and the death penalty for the same underlying offense violate his right to be free from double jeopardy.[9] Allen waived this issue by failing to preserve it for appeal, however, because he did not raise this argument in the district court prior to trial. <u>See</u> Fed. R. Crim. P. 12(b)(2) (requiring that defenses and objections based on defects in an indictment be raised before trial or

---

[9]<u>See</u> U.S. Const., amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb").

they are waived); United States v. Prescott, 42 F.3d 1165, 1167 (8th Cir. 1994) (holding that failure to raise pretrial objection to alleged duplicitous counts in the indictment constitutes waiver of the defense); United States v. Shephard, 4 F.3d 647, 650 (8th Cir. 1993) (holding that Fed. R. Crim. P. 12(b)(2) requires that challenges based on multiplicitous counts in an indictment and related double-jeopardy problems be raised before trial or they are waived). Reviewing for plain error, we find none. See United States v. Sickinger, 179 F.3d 1091, 1092-93 (8th Cir. 1999) (reviewing a double jeopardy claim for plain error even though it was not raised in the district court); United States v. Jackson, 155 F.3d 942, 947 (8th Cir. 1998) (same).

In a single trial where separate and consecutive sentences are imposed for the same underlying circumstances, the Double Jeopardy Clause does no more than prevent a sentencing court from prescribing greater punishment than a legislature intended. See Missouri v. Hunter, 459 U.S. 359, 368 (1983). In the present case then, imposition of multiple punishments for the same underlying circumstances does not violate the Constitution as long as Congress intended it. See Albernaz v. United States, 450 U.S. 333, 344 (1981). Thus, we first consider whether the two statutes under which Allen was convicted and sentenced prohibit the same offense, and if so, whether there is a clear indication that Congress in fact intended multiple punishments for that offense. See Hunter, 459 U.S. at 367. If the offenses are not the same, and absent clear contrary legislative intent, there is no double jeopardy violation. See id.

The Supreme Court has consistently used the test from Blockburger v. United States, 284 U.S. 299 (1932), as the initial starting point for determining legislative intent. See Albernaz, 450 U.S. at 345 n.3 (explaining that "the established test for determining whether two offenses are the 'same offense' is the rule set forth in Blockburger"). Under Blockburger, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304.

21

Examining the two statutes at issue, it is clear from the face of 18 U.S.C. §§ 2113(a) and (e) (Count I) and 18 U.S.C. §§ 924(c)(1) and (j)(1) (Count II) that Count II requires proof of two facts which Count I does not--namely, that a firearm was used or carried during the commission of a violent crime and that a murder occurred by use of the firearm. The more difficult question is whether Count I requires proof of a different fact than Count II. It is not exactly clear how predicate offenses are to be treated for purposes of Blockburger. There is some indication from the Supreme Court that Blockburger is simply a rule of statutory construction which is neither intended nor designed to apply to the particular facts of a case. See Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975) (explaining that if each offense requires proof of a fact the other does not, the Blockburger test is satisfied notwithstanding a substantial overlap in the proof offered to establish the crimes); Blockburger, 284 U.S. at 304 (finding that although both sections of the narcotics statute were violated by one sale, two offenses were committed because each section required proof of a fact the other did not). Looking solely at the elements of the offenses at issue here, Count I arguably is not the same offense as Count II because Count II does not require proof of a taking of bank property by force or violence or intimidation, but rather only proof of some underlying crime of violence which could be armed robbery or any other violent felony.

On the other hand, the Supreme Court has applied Blockburger by considering the nature of the underlying felony in a felony-murder indictment rather than based only on the elements of the statutes at issue. See Whalen v. United States, 445 U.S. 684, 694-95(1980) (finding that rape and killing in the course of a rape did not pass muster under the Blockburger test because rape was a lesser included offense). Under this interpretation of Blockburger, predicate offenses which form the basis of other statutory offenses would always fail the Blockburger test. In the present case, the underlying bank robbery satisfies the "crime of violence" element of §§ 924(c) and (j). By

22

definition, therefore, there is no fact that must be proved in § 2113 that is different from the elements required to be proved for conviction under §§ 924(c) and (j).[10]

In light of these conflicting views of how to apply the Blockburger test to two statutes where one can be a predicate offense for the other, we think it best to err on the side of leniency by finding that the Blockburger test has not been satisfied. However, we still must consider the ultimately dispositive question of whether Congress clearly intended to impose cumulative sentences for simultaneous violations of each of the statutes.  See Hunter, 459 U.S. at 368 (reasoning that simply because two criminal statutes may proscribe the same conduct under the Blockburger test does not mean double jeopardy precludes cumulative punishment because courts cannot negate clearly expressed legislative intent).

We have repeatedly held that multiple prosecutions and cumulative sentences for bank robbery under § 2113 and for using a firearm pursuant to § 924(c) are clearly intended by Congress and thus permissible. See, e.g., United States v. McQuiston, 998 F.2d 627, 629 (8th Cir. 1993) (upholding defendant's sentence of 300 months for four armed robberies in violation of § 2113 and an additional four consecutive sentences of 120 months each for violating § 924(c) during the course of each of those robberies). Section 924(c) explicitly states that its punishment is to be imposed "in addition to the punishment provided for such crime of violence."  18 U.S.C. § 924(c)(1) (1994).  See also id. ("nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence . . . in which the firearm was used or carried").  This language leaves no

_____

[10]The government argues that because Count I requires proof of a killing and Count II requires proof of murder pursuant to § 1111(a), each offense really does require proof of an additional fact that the other does not.  We reject the argument, however, because proof of a murder under Count II necessarily requires proof of a killing as required by Count I.

23

doubt that Congress intended to impose multiple, cumulative punishments under § 924(c).

Allen argues that § 924(j) should be construed independently of § 924(c) because it does not contain the same "in addition to" language, the legislative history suggests Congress only intended to authorize the death penalty for violation of § 924(j) if the death penalty was not already authorized for the underlying violent offense, and any ambiguity must be resolved in favor of a defendant based on the rule of lenity. We respectfully reject Allen's contentions. First, § 924(j) expressly incorporates § 924(c) and requires a violation of § 924(c) prior to imposition of the penalties set forth in § 924(j). Thus, § 924(j) cannot be read independently from the context of the punishment scheme set out in § 924(c). Although § 924(j) does not explicitly contain the same express mandatory cumulative punishment language as found in § 924(c), it incorporates § 924(c) by reference without disclaiming the cumulative punishment scheme which is so clearly set out in § 924(c).

Second, when read in context of the criminal scheme set forth in § 924(c), we think § 924(j) is fairly interpreted as an additional aggravating punishment for the scheme already set out in § 924(c). We reach this conclusion because of § 924(j)'s explicit reference to § 924(c) and because each subsection of the statute is designed for the same purpose--to impose steeper penalties on those criminals who use firearms when engaging in crimes of violence. Moreover, Allen's proposed interpretation of § 924(j) would lead to the odd result that a defendant convicted under § 924(c) is subject to an additional consecutive sentence only in situations that do not result in a death caused by use of the firearm. We think it unlikely that Congress, which clearly intended to impose additional cumulative punishments for using firearms during violent crimes in cases where no murder occurs, would turn around and not intend to impose cumulative punishments in cases where there are actual murder victims.

24

Third, §§ 2113(a) and (e) and §§ 924(c) and (j) were clearly designed for different purposes: the armed robbery statute was designed to punish those who take money from banks by force or violence, whatever the means, and the firearm statute was designed to punish those who use or carry firearms during violent crimes, whatever the underlying crime.

We therefore conclude, notwithstanding our assumption of the likely failure of the two statutes to pass the Blockburger test, that Congress fully and clearly intended to permit cumulative punishments for violations of § 2113 and § 924(j). See United States v. Kragness, 830 F.2d 842, 864 (8th Cir. 1987) (holding that Congress intended to allow multiple punishments for RICO conspiracies and conspiracies to commit the underlying predicate offense even though the offenses were the same under the Blockburger test). We also reject Allen's proposed reliance on the rule of lenity because Congress's intent is quite clear and not ambiguous. Based on the foregoing reasons, the district court did not commit plain error under the Fifth Amendment's double jeopardy protections by submitting Counts I and II to the jury or by imposing separate sentences after Allen's conviction on each count.

Allen also argues that his double exposure to a sentence of death for one underlying crime unduly emphasized the death penalty to the jury and impermissibly skewed the deliberative process in favor of a death sentence in violation of the Eighth Amendment's prohibition against cruel and unusual punishment and the Fifth Amendment's due process right to a fair trial. We again respectfully disagree. Even if Allen's argument is a valid claim under the Eighth Amendment, a matter which we do not reach, we find that Allen has not shown that the scales of justice were skewed in favor of a death sentence. The jury instructions did not unduly emphasize the death sentence option over life in prison, and the instructions made it clear to the jury that they were supposed to evaluate each charged count separately and independently. Given that the jury returned different sentences under each count, there is little doubt the jury followed its instructions. Allen speculates that the reason the jury returned a

25

sentence of death on Count II was that the jury must have been so overwhelmed by having to make two separate weighings of all the mitigating and aggravating circumstances such that the mitigation evidence must not have survived the second weighing. A more plausible and principled explanation for the jury's decision on Count II is that the evidence shows that Allen was far more culpable for the firearm count than the armed bank robbery count. The jury most likely found that Allen was primarily responsible for firing the shots that killed Richard Heflin, and, given Holder's leadership in planning, preparing, and instigating the bank robbery, that Allen was less culpable for committing the bank robbery. Thus, we find little evidence to support Allen's contention that the submission of two separate death-versus-life-in-prison decisions to the jury violated Allen's constitutional rights. See, e.g., United States v. McVeigh, 153 F.3d 1166, 1176 (10th Cir. 1998) (upholding Timothy McVeigh's eleven sentences of death as a result of his conduct and convictions for the bombing of the Oklahoma City federal building), cert. denied, 526 U.S. 1007 (1999).

### 3. Alleged Trial and Sentencing Errors

Allen asserts that the district court committed numerous errors during the trial, each of which allegedly warrants this court granting him a new trial or a new sentencing. We address each of his contentions in order, and as explained below, conclude that none of the asserted district court errors entitle Allen to a new trial or a new sentencing.

### a. Denial of Continuance

Allen asserts that the district court abused its discretion in denying Allen's motion for a continuance of the trial after Allen's mitigation expert quit ten days prior to trial with little of his work done. The facts are as follows. The government filed its notice of intent to seek the death penalty on August 8, 1997. Defense counsel hired a mitigation expert in early September. On October 15, Allen's case was set for trial on February 9, 1998. On January 12, 1998, the original mitigation expert informed

defense counsel that he could not fulfill his obligations. Defense counsel hired a new mitigation expert on January 15 who started working on Allen's mitigation defense on January 16. Allen filed his motion for continuance on January 29, requesting that the trial be delayed for 120 days in order to prepare adequately the mitigation evidence for use during sentencing. The district court denied the motion for a continuance on the grounds that substantial work had been completed on Allen's mitigation defense and that sufficient time remained to finish preparations. Jury selection began on February 9, trial commenced on February 17, the sentencing began on March 2, and Allen presented his mitigation evidence from March 3 to March 6.

> We review rulings on requests for continuances under the following standard:
>
> District courts are afforded broad discretion when ruling on requests for continuances. Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason. We will reverse a district court's decision to deny a motion for continuance only if the court abused its discretion and the moving party was prejudiced by the denial.

United States v. Cotroneo, 89 F.3d 510, 514 (8th Cir.)(citations omitted), cert. denied, 519 U.S. 1018 (1996). "Abuse of discretion is determined by looking at the particular circumstances of the case." United States v. Ware, 890 F.2d 1008, 1010 (8th Cir. 1989) (citing Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). Our review of the circumstances of this case convinces us that the district court did not abuse its discretion in denying Allen's request for a continuance.

The replacement mitigation expert had worked on Allen's case for two weeks prior to the continuance request, and at the time the motion for the continuance was filed he had over four weeks left to prepare Allen's sentencing defense. In addition, the defense never renewed its motion for a continuance at the start of the penalty phase.

27

Thus, the evidence supports the district court's finding that the defense had sufficient time to prepare an adequate mitigation defense.

Furthermore, the defendant has failed to show any specific prejudice resulting from the denial of his request for a continuance. Allen's mitigation evidence consisted of three days of testimony, totaling over nine hundred pages of transcript, and involved thirty-six witnesses testifying on Allen's behalf in support of four statutory mitigating factors and twenty-two nonstatutory mitigating factors. Allen does not point to any specific mitigation evidence that he was deprived of presenting to the jury due to the district court's denial of his request for a continuance. See Walls v. Bowersox, 151 F.3d 827, 836 (8th Cir. 1998), cert. denied, 526 U.S. 1071 (1999). In fact, on the basis of the evidence presented, the jurors were able to identify three additional mitigating factors which they considered during deliberations.

Allen argues general prejudice on the basis that there was not overwhelming evidence in support of the jury's decision to sentence Allen to death on Count II, given the jury's decision not to impose a sentence of death on Count I. We disagree. There was overwhelming evidence that Allen was responsible for firing all or at least most of the shots that killed the security guard, which is more than enough to support the jury's finding that the aggravating factors outweighed the mitigating factors thus warranting a sentence of death. We therefore need not address the question of whether Allen had a compelling reason for requesting a continuance of the trial (no explanation was ever given for the delay in discovering the nonperformance of the original mitigation expert), because we find neither an abuse of discretion by the district court nor any prejudice as a result.

b. Failure to Disclose Upcoming Inconsistent Testimony

Allen argues, based on Brady v. Maryland, 373 U.S. 83 (1963), that his due process rights to a fair trial were violated by the government's failure to disclose that two government eyewitnesses--Betty Thompson and William Green--would testify at

trial inconsistently with previous statements attributed to them as contained in FBI reports, and that the district court therefore abused its discretion in denying Allen's motion for a mistrial or to strike some of the witnesses' testimony. We will affirm a district court's decision denying a request for a mistrial unless we find "an abuse of discretion resulting in clear prejudice" to the defendant. United States v. Rhodenizer, 106 F.3d 222, 225 (8th Cir. 1997) (internal quotations omitted). See United States v. Wadlington, 233 F.3d 1067, 1077 (8th Cir. 2000); see also United States v. Ryan, 153 F.3d 708, 711 (8th Cir. 1998)(applying the same standard to denial of motion for new trial based on Brady violation allegations), cert. denied, 526 U.S. 1064 (1999). In order to establish a Brady violation, a defendant must show that the government suppressed exculpatory evidence material either to guilt or punishment. See Ryan, 153 F.3d at 711.

> Evidence is material under Brady if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. However, materiality is not established through the mere possibility that the suppressed evidence might have influenced the jury.

Id. at 712 (internal quotations and citations omitted).

We agree with the district court that there has been no Brady violation. First, the witnesses' expected trial testimony was not Brady evidence because the witnesses testified at trial and the defense was provided with the necessary impeachment evidence (in this case the FBI reports). See United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) (noting that Brady is not violated by a delay in disclosing evidence so long as the evidence is disclosed during trial). Second, Allen has not shown that the change in testimony satisfies the element of materiality. The statements of witnesses Thompson and Green were inconsistent only as to the issue of whether the driver or the passenger was carrying the bag of money as the two defendants reentered the van after

29

the robbery. Whether Holder or Allen carried the bag, however, has almost no probative value as to whether Allen was guilty of the charged offenses, and has only some probative value as to who actually shot Heflin, which was relevant to the jury's sentencing decision. Moreover, the other evidence convincingly showed that Allen actually did most of the shooting. In short, our confidence in the jury's verdict as a result of any delayed disclosure of the negligibly exculpatory information is not at all undermined, because earlier disclosure of the information would have had no effect on the outcome of the jury's verdict.

Nor do we find any clear prejudice. The prosecutor expressly stated during opening argument that witness Green was going to testify that the driver was carrying the bag, which was contrary to Green's statement to the FBI. (See Trial Tr., Vol. VI at 52 ("A few moments later [Mr. Green] saw two men run to the van, the driver carrying a bag, both men carrying what looked to him to be long-barreled weapons.").) Given that there is little doubt that Holder was the driver of the van, the prosecutor's remarks during his opening statement alerted defense counsel to the inconsistency between witness Green's prior statements and his expected trial testimony. Moreover, defense counsel had the necessary impeachment material--the FBI reports--and we agree with the district court that defense counsel did a very effective job of using the inconsistencies to impeach the credibility and accuracy of Green's trial testimony. (See Trial Tr., Vol. VIII at 198.) Thus, not only did defense counsel have notice of the inconsistency between Green's statements to the FBI and his testimony at trial, but counsel also had and effectively used the FBI report during cross-examination to impeach Green's testimony. Finally, defense counsel never asked for a continuance to deal with Green's allegedly surprising and prejudicial change in testimony, and never even raised an objection at the time Thompson's change in testimony was discovered. Based on these circumstances, we do not find any clear prejudice to Allen. We therefore reject Allen's contention that the district court abused its discretion in denying Allen's request for a mistrial because there was no Brady violation by the government and there was no clear prejudice to Allen.

30

c.  Court-Ordered Psychiatric Examination

Allen asserts that the district court erred in ordering him to undergo a psychiatric examination by a government-selected psychiatrist without a full protective order and in allowing a prosecutor to violate the terms of the court's partial protective order. We find no constitutional error and therefore reject both claims.

There is no doubt that a district court has the authority to order a defendant who states that he will use evidence from his own psychiatric examination in the penalty phase of a trial to undergo a psychiatric examination by a government-selected psychiatrist before the start of the penalty phase. See United States v. Webster, 162 F.3d 308, 338-40 (5th Cir. 1998) (holding that a district court possesses the inherent power to order a psychiatric examination based on 18 U.S.C. § 3593(c), which requires that the government be given a "fair opportunity" to rebut any of defendant's mitigating evidence, and Fed.R.Crim.P. 12, which allows a court-ordered psychiatric examination during similar circumstances in the guilt phase of trials), cert. denied, 528 U.S. 829 (1999).  See also Estelle v. Smith, 451 U.S. 454, 466 n.10, 472 (1981) (leaving open the possibility, without deciding it, that a defendant can be precluded from using psychiatric evidence during the penalty phase if he does not also consent to a prosecution-selected psychiatrist).  The government must be able to put on a fair rebuttal to a defendant's mitigation evidence during sentencing.  Here, the district court allowed one assistant prosecutor to begin evaluating the results of the government's psychiatric examination prior to the sentencing phase under an order to not divulge any of the results to the rest of the prosecution team until after the completion of the guilt phase.[11]  This partial protective order is legally and constitutionally sufficient because, as explained by the Fifth Circuit, a defendant is adequately protected under the Constitution from impermissible early introduction of the fruits of a government

_____

[11]The procedure is described by all counsel in the record as erecting "a Chinese wall" between the prosecution's guilt phase trial team and the Assistant United States Attorney who was designated to receive the psychiatric reports.

psychiatric examination under a scheme wherein the defendant has the burden of producing some evidence of taint, and the government has the ultimate burden of persuading the court that the evidence is not tainted. United States v. Hall, 152 F.3d 381, 399 (5th Cir. 1998) (citing Alderman v. United States, 394 U.S. 165, 183 (1969)), cert. denied, 526 U.S. 1117 (1999), abrogated on other grounds by United States v. Martinez-Salizar, 528 U.S. 304, 317 (2000). Additional prophylactic safeguards beyond this evidentiary framework, such as the sealing of exam results until after the completion of the guilt phase, as the court did in United States v. Beckford, 962 F. Supp. 748, 761 (E.D. Va. 1997), may avoid later litigation but are not constitutionally required. See Hall, 152 F.3d at 399. We therefore decline to adopt any such rigid prophylactic rule in the name of the Constitution and leave the matter to the discretion of district courts, subject only to our review for abuse of discretion, which we do not find present in this case.

As for Allen's allegations of prosecutorial misconduct, after a careful review of the record we find neither a breach of the district court's protective order nor any prejudice to Allen during the guilt phase had the prosecutor's comments been a breach. The government requested that the entire prosecution team be allowed to review the results of the court-ordered psychiatrist's interview with Allen before the end of the trial so that they could begin researching possible defenses Allen might raise. The Assistant United States Attorney (AUSA) designated to receive the results of the court-ordered psychiatrist's interview with Allen made the following statement in open court, without the jury present, in response to Allen's assertion that the results should continue to be excluded from the entire prosecution team because they might be used against him during the guilt phase of the trial:

> There really isn't anything in any of these reports that would prejudice the defendant if the prosecution team was made aware of them prior to the beginning of the penalty phase. In fact, Mr. Allen does not seem to discuss the offense or wasn't even asked about the offense with either one of the physicians that were chosen by the defense and there was no

discussion of it with the court-appointed psychiatrist beyond Mr. Allen's maintaining that he wasn't there, so there isn't anything in these reports that could be exploited in the guilt phase of any type that I can see.

(Trial Tr., Vol. X at 2-3.)

Allen argues that the AUSA's disclosure, in the presence of other members of the prosecution team, of Allen's statement to the government psychiatrist that Allen was not present at the armed bank robbery is a violation of the court's protective order and a structural defect in the trial. We disagree. While the defense did express the view that the Chinese wall had been breached, it did not raise a formal objection at the time the comment was made, and the district court's failure to take any action <u>sua</u> <u>sponte</u> in response to the comment or to the allegation that its order had been violated, makes clear that it did not consider it to be a violation of the order. We see no violation either because the defendant had denied being present at the armed robbery as early as July 25, 1997, in his Notice of Intent to Rely Upon Defense of Alibis, so the prosecution team was already on notice from Allen himself that Allen might argue an "I wasn't there" defense. Thus, the AUSA's disclosure had little, if any, impact on the prosecution's presentation of evidence, and for that reason, even if the AUSA's disclosure was a technical violation of the court's protective order, Allen was certainly not prejudiced by the disclosure.

We also reject Allen's assertion that the disclosure effectively precluded or "chilled" him from exercising his right to testify at trial because he was afraid that all of the examination results had been disclosed to the entire prosecution team. The defendant could have taken the stand and still have protected his Fifth Amendment rights by alleging specific violations of the court's protective order if the government appeared to be improperly using information from the psychiatric examination. The decision was made to forego this protection, and on appeal Allen points to no specific improper uses of the results or contents of the psychiatric examination during the guilt phase of the trial. We therefore hold that the AUSA's disclosure does not, as Allen

33

argues, rise to the level of a structural error (which he argues requires no showing of prejudice), nor do we find any abuse of discretion by the district court or prejudice to Allen with respect to the court-ordered psychiatric examination and partial protective order.

### d. Improper Prosecutorial Statements

Allen argues that government prosecutors made improper and prejudicial statements during the penalty phase which rendered the jury's sentencing decision fundamentally unfair. Specifically, Allen points to three allegedly improper statements: (1) a direct reference to Allen as a "murderous dog" during closing arguments; (2) a statement saying "don't let him down there dribbling basketballs on Richard Heflin's grave" during closing arguments; and (3) a question to one of Allen's witnesses about whether the blue color of his clothing signified his association with any gang. Allen argues that, given the fact that he is an African-American, each of these statements was designed to appeal to racial fears and prejudices of jury members in order to secure a death sentence, and that it did have this improper effect.

Our standard of review is as follows:

> We afford the district court broad discretion in controlling closing arguments, overturning the lower court only when it clearly abuses its discretion. We examine prosecutorial remarks to determine, first, whether the remarks were in fact improper, and if so, whether, in the context of the entire trial, the remarks prejudicially affected [the defendant's] substantial rights, so as to deprive [him] of a fair trial.

United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996) (internal quotations and citations omitted). See also Darden v. Wainwright, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (internal quotations and citations omitted).

34

We first address whether the prosecutor's statements were in fact improper. Given the context surrounding the statements, we are convinced that neither the basketball comment nor the gang reference was improper. The basketball reference was made after several of Allen's own mitigation witnesses, such as his middle school basketball coach and relatives, testified that Allen enjoyed playing basketball, and therefore later reference to it by the prosecution was not improper. (See, e.g., Trial Tr., Vol. XV at 130, 167.) The gang affiliation question came up during cross-examination of one of Allen's witnesses in the context of determining, as alleged in one of the mitigating factors, whether Allen was a "follower." The prosecutor's questions were directed at discovering whether either Allen or the witness or both were ever involved in gang activity, and we find nothing wrong with the questions because they were relevant to and in response to the mitigating factors presented by Allen, which indicated he grew up surrounded by gang factions. Furthermore, in the circumstances of this case, we find that the prosecutor's statements--both the basketball comment and the gang affiliation questions--were not intended nor did they have the effect of appealing to racial fears or to any prejudices of the jurors.

The characterization of Allen as a "murderous dog" presents a closer question. The comment was made in response to one of Allen's proposed nonstatutory mitigating factors, which portrayed Allen as a "likeable, gentle, lighthearted person" who "was not considered aggressive or violent."[12] (Allen's App. at 405.) During closing argument, moreover, Allen's counsel made the assertion that the prosecution "[c]ouldn't find a single person to say [Allen] was violent." (Trial Tr., Vol. XIX at 77.) In rebuttal closing argument, the prosecutor responded as follows:

---

[12]The mitigator submitted by Allen to the jury read as follows: "Despite growing up in a neighborhood that was surrounded by gang factions, and losing several close friends to gang violence, Billie Allen was known as a likeable, gentle, lighthearted person. The offenses for which he has been convicted are inconsistent with his prior behavior. He was not considered aggressive or violent." (Allen's App. at 405.)

How about the mitigator that you're going to see on that verdict form that this defendant is a gentle, lighthearted, likable person? He's "considered" those things, okay? That's important. It says he's considered kind, gentle, and lighthearted. He's not considered violent or aggressive. Richard Heflin didn't think this guy with the mask, armed for war, armed to kill, was kind, lighthearted, or gentle. He thought he was a murderous dog coming in there to kill people for money. That's what Richard Heflin thought. And remember when you are back there deliberating, the last thing Richard Heflin ever saw was these two come in and start blazing at him, blow him down – and the terrible irony is he survived Vietnam, survived Vietnam, managed to live through having to fight people with guns just like that, and he's killed at High Point in St. Louis City on St. Patrick's day, that is a terrible irony.

(Trial Tr., Vol. XIX at 105-06.) Although we find no improper appeal to racial fears or prejudice in the above statement, we do find that the reference to Allen as being a "murderous dog" is inappropriate and improper. See Darden, 477 U.S. at 179-80 (finding it improper to characterize the defendant as an "animal").

We will not, however, reverse a sentence on the basis of improper prosecutorial statements unless those statements are prejudicial enough to deprive a defendant of his constitutional rights to a fair penalty phase hearing. At the outset, we reject Allen's contention that in a capital case there is greater protection under the Fifth Amendment's Due Process Clause[13] for a fair penalty phase hearing than there is for a fair trial. In determining whether Allen has received a fair penalty phase hearing, we therefore adopt the same standard set out by the Supreme Court and this court in determining whether a defendant has received a fair trial under the Constitution despite improper prosecutorial comments during trial. See, e.g., Darden, 477 U.S. at 181 (holding that "[t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process"); Cannon, 88

―――――――――――――――

[13]See U.S. Const., amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").

F.3d at 1502 (outlining a three-factor test to help determine, in the context of the trial as a whole, whether a defendant has been deprived of a fair trial, including the cumulative effect of any misconduct, the strength of the properly admitted evidence of guilt, and any remedial actions taken by the trial court).

Although we find that the prosecutor's reference to Allen as a "murderous dog" was improper, we have little difficulty in deciding that in this case Allen was not deprived of his constitutional right to a fair sentencing. First, the comment was made only once and did not manipulate or misstate the evidence. See Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996) (finding despite numerous references to the defendant as a "killer" that the entire trial was not so fundamentally unfair as to amount to a deprivation of due process, in part because the prosecutor's statements did not manipulate or misstate the evidence), cert. denied, 520 U.S. 1109 (1997). Although it is possible that one isolated comment can result in the denial of a defendant's due process right to a fair trial or sentencing, the lack of any cumulative effect of more than one improper comment is certainly a strong indication that the sentencing was not fundamentally unfair. Second, the evidence is essentially overwhelming that Allen fired the shots from the Chinese SKS that killed Richard Heflin, which helps explain why the jury imposed a death sentence for the firearm conviction and a life sentence for Allen's armed robbery conviction (the evidence shows that Holder was primarily responsible for initiating and planning the armed robbery). Thus, if the prosecutor's improper statement was as emotionally prejudicial as Allen claims, we think it likely that the jury would have returned a sentence of death on both counts, so the fact that the jury returned a sentence of life in prison for the armed robbery conviction is strong evidence that its decisions were not based on passion. Third, the trial court was not called upon to take any curative actions because the defendant never objected to the remark, and the experienced trial judge did not intervene sua sponte, a decision we do not find to be error of any kind. The court did instruct the jury to make its decision based only on the evidence and that statements by the lawyers were not evidence. This is sufficient in the absence of an objection. Id. at 643-44.

We also reject Allen's argument that the murderous dog reference, in combination with telling the story through the eyes of the victim, makes the statement unduly prejudicial. No undue prejudice arises from reminding the jury to consider the murder victim's perspective where the defendant has asserted a gentle spirit and accused the government of being unable to produce any witness to testify that the defendant was violent. For these reasons, we conclude that Allen's penalty phase was not unfairly prejudiced by the prosecutor's "murderous dog" reference, and therefore he was not denied his due process right to a fair sentencing. See Darden, 477 U.S. at 180-81 (finding during habeas review of a death penalty conviction that the defendant was not deprived of his right to a fair trial despite the prosecutor's references to the defendant as an "animal" that "shouldn't be out of his cell unless he has a leash on him"); Kellogg v. Skon, 176 F.3d 447, 451-52 (8th Cir. 1999) (finding in criminal sexual abuse case that defendant did not receive a fundamentally unfair trial even though the prosecutor referred to him as a "monster," "sexual deviant," and "liar"); Pollard v. Delo, 28 F.3d 887, 890 (8th Cir. 1994) (finding that repeated references to the defendant as a "predator" were not so prejudicial as to deprive the defendant of a fair trial).

### e. Victim Impact Evidence

Allen argues that the district court erred in overruling his motion to limit the quantity of victim impact evidence introduced by the government during the sentencing phase, and that this decision ultimately led to a violation of his Eighth Amendment rights because the government was allowed to present too much victim impact evidence. We normally review evidentiary decisions under an abuse of discretion standard. See United States v. Martin, 180 F.3d 965, 966 (8th Cir. 1999). In this case, however, Allen failed to raise an objection to any of the victim impact testimony. Although Allen filed a motion to limit the government's evidence before any of it was introduced, in denying the motion the district court made it quite clear that it would be necessary to raise objections later in order to preserve the issue for appeal. The district court stated the following:

The parties will note that motions in limine are advisory only, that is orders in limine are advisory only. The parties will be required to make appropriate objections or offers of proof at the proper time during the trial to protect their respective positions. . . . The Court will consider victim impact [testimony] as it is presented. I have no way of knowing at this time precisely what it will be. Parties understand the statutory scheme which provides for the impact testimony and also the body of concept of cases dealing on that subject and neither -- and the government should not go beyond the bounds of either the statute or the case law.

(Trial Tr., Vol. XIV at 34-36.)

Due to Allen's failure to raise any objections during the sentencing phase to the victim impact testimony, we review Allen's claim for plain error. Thus, Allen

must therefore show that the error was plain, meaning clear or obvious; and [that] the error affected [his] substantial rights, which requires a showing that the error was prejudicial and affected the trial's outcome. Even clear errors will only matter if a miscarriage of justice would otherwise result that might seriously affect the fairness, integrity or public reputation of the judicial proceedings.

United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999) (citing United States v. Olano, 507 U.S. 725, 733-35 (1993)) (alterations in original) (internal quotations and citations omitted).

First, it is clear from both the FDPA and Supreme Court precedent that the government is allowed to present and a jury is allowed to consider victim impact evidence in reaching its sentencing decision in a capital case. The FDPA provides for the submission of aggravating factors that may concern "the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement" identifying the victim and the loss suffered by the victim and the victim's family, "and any other relevant information." 18 U.S.C. § 3593(a)(2). Likewise, the Supreme Court has ruled that the Eighth Amendment "permits capital sentencing juries

39

to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." Jones v. United States, 527 U.S. 373, 395 (1999) (citing Payne v. Tennessee, 501 U.S. 808, 827 (1991)). See Payne, 501 U.S. at 830-31 (explaining that the Eighth Amendment does not bar a jury from considering "the full extent of the harm caused by the crime, including its impact on the victim's family and community" or from seeing "a quick glimpse of the life petitioner chose to extinguish to remind the jury that the person whose life was taken was a unique human being," and further explaining that a defendant may still seek relief under the Due Process Clause of the Fourteenth Amendment "[i]f, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair")(internal quotations and citations omitted)(O'Connor, J., concurring).

Second, there is little, if any, danger of undue prejudice due to victim impact evidence under the FDPA if a jury, as in this case, fails to even find the existence of the victim-impact aggravating factor. (See Trial Tr., Vol. XIX at 123, 132.) This is because the FDPA prohibits a jury from considering, in the final weighing of aggravating and mitigating circumstances, any aggravating factor which the jury did not find unanimously beyond a reasonable doubt. See 18 U.S.C. § 3593(d), (e). The instructions to the jury were clear on this point, and unless a jury disregards its instructions, which we do not and cannot presume, there can be no prejudice. See Francis v. Franklin, 471 U.S. 307, 325 n.9 (1985)("[a]bsent [] extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions"); United States v. Delpit, 94 F.3d 1134, 1144 (8th Cir. 1996).

Third, although the jury did not find the existence of the victim-impact aggravating factor, which is strong evidence of and in most cases will be sufficient to make a ruling of no undue prejudice, we will nevertheless consider the possibility that the evidence may have been so prejudicial as to violate the Due Process Clause. Our

review of the record, however, convinces us that no such violation occurred. The government's evidence of victim impact consisted of testimony from eleven witnesses, including Richard Heflin's mother, one sister, one brother, two bank coworkers, one former coworker, his former wife (and mother of his three sons), each of his three sons, and his widow (who had married Heflin approximately seven months prior to his death). The testimony from these witnesses lasted less than a day and took up only eighty-eight pages of transcript. In comparison, the entire penalty phase transcript takes up over seventeen hundred pages, and the testimony from Allen's penalty phase witnesses took up over nine hundred pages. Furthermore, Allen could have objected to any specific testimony that he thought was unduly prejudicial, and he could have raised an objection if he believed the amount of testimony had become unduly prejudicial. For tactical reasons, such objections could have been lodged at a side bar conference outside of the jury's hearing. No objections were raised, however, and on appeal Allen makes no allegations that any specific testimony was unduly prejudicial. Our own review of the record convinces us that neither the amount nor the scope and nature of the victim-impact testimony was unduly prejudicial.

For all of the above stated reasons, we find that the district court did not commit any error, much less plain error, in its decision to deny Allen's motion in limine at the outset of the sentencing hearing and later to permit all of the government's victim impact evidence to come into the record without objection.

### f. Death Penalty Selection Instructions

Allen argues that the district court erred in failing to submit to the jury his tendered "mercy instruction" which would have informed the jury that they never are required to impose a sentence of death. "When reviewing a challenge to the jury instructions, we recognize that the district court has wide discretion in formulating the instructions and [we] will affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." United States v. Phelps,

41

168 F.3d 1048, 1057 (8th Cir. 1999) (citing <u>United States v. Casas</u>, 999 F.2d 1225, 1230 (8th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1078 (1994)).

Our review of the instructions given to the jury convinces us that the district court committed no error in fairly and adequately presenting the applicable law. The relevant portions of the district court's instructions to the jury were as follows:

> Again, whether or not the circumstances in this case justify a sentence of death is a decision that the law leaves entirely to you. . . . If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death . . . you shall record your determination that death is justified in Section 6A of the special verdict form for each count of the indictment.

(Instr. No. 8, Trial Tr., Vol. XIX at 37-38.) The district court also instructed the jury that, "[a]t the end of your deliberations, if you determine that Billie Jerome Allen should be sentenced to death or to life imprisonment without possibility of release, the Court is required to impose that sentence." (Instr. No. 9, <u>id.</u> at 39.)

We think these instructions accurately explain the jury's role in sentencing under the FDPA, which reads as follows:

> [T]he defendant . . . <u>shall</u> be sentenced to death <u>if</u>, after consideration of the factors set forth in section 3592 [delineating possible aggravating and mitigating circumstances] in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is <u>justified</u> . . . .

18 U.S.C. § 3591(a)(2) (emphasis added). In § 3593, entitled "Special hearing to determine whether a sentence of death is justified," the FDPA states the following:

> [T]he jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death . . . . <u>Based upon this consideration</u>, the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

18 U.S.C. § 3593(e) (emphasis added). Based upon the plain language of the statute, once a jury makes a final, unanimous determination that a sentence of death is justified, then the FDPA requires its imposition. <u>See</u> 18 U.S.C. § 3594 (requiring that once a recommendation of death or life imprisonment is made, "the court shall sentence the defendant accordingly").

Allen argues that the language in § 3593(e) requires a jury to make two decisions--first, whether a sentence of death is justified and second, whether a sentence of death should actually be imposed. Although § 3593(e) could lend itself to this interpretation when read in isolation, we reject this interpretation as inconsistent with the Act as a whole.[14] <u>See</u> <u>Harmon Indus., Inc. v. Browner</u>, 191 F.3d 894, 900 (8th Cir. 1999) (noting that we apply common sense meaning to the text of statutes and interpret provisions "in a manner logically consistent with the Act as a whole"). Allen's two-decision interpretation of § 3593(e) would allow the jurors to disregard a unanimous determination that a sentence of death is justified. We conclude that such an interpretation contradicts the language of § 3591(a)(2), stating that a defendant <u>shall</u> be sentenced to death if the fact finder determines that a sentence of death is justified

---

[14]We also note, and reject, Allen's assertion that the legislative history supports his interpretation of the statute. At most, the legislative history shows that language both expressly requiring that a mercy instruction be given and language expressly prohibiting a mercy instruction from being given was proposed and then deleted, for whatever reasons, from the final version of the FDPA passed by Congress and signed by the President. We are thus left to interpret, as best we can, the proper meaning of the FDPA that was actually enacted into law.

after weighing the aggravating and mitigating circumstances. To consistently harmonize the two sections, we must read § 3593(e) as specifying the jury's options within this framework. We already know from § 3591(a)(2) that a unanimous finding that death is justified requires a recommendation of a death sentence. The jury's remaining options, then (life imprisonment without possibility of release or some other lesser sentence), are only valid options for the jury to recommend if the balancing process favors the mitigating factors and does not justify a sentence of death.

Thus, we read the requirement in § 3593(e) that the jury recommend by unanimous vote the sentence to be imposed to be a procedural mechanism to record the jury's findings, first on the question of whether a death sentence is justified, and if not, then on whether the sentence should be life in prison or some other sentence imposed by the court. We do not read § 3593(e) as requiring from the jury a second, substantive determination regarding a sentence of death once it decides that a sentence of death is indeed justified.

In another context, the Controlled Substances Act, Congress clearly has provided that the jury "regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence." 21 U.S.C. § 848(k) (requiring the jury to be instructed in this manner). This language would explicitly allow the jury to make the second, substantive determination that Allen seeks. No similar language exists in the FDPA, however, and we are not permitted to legislate this language into the Act ourselves, particularly in light of the contrary language explained above which already exists in the FDPA.

Under the FDPA, the jury exercises complete discretion in its determination of whether the aggravating factors outweigh the mitigating factors. The jury was informed that whether or not the circumstances justify a sentence of death was a decision left entirely to them. Mercy is not precluded from entering into the balance of whether the aggravating circumstances outweigh the mitigating circumstances. The FDPA merely

44

precludes the jurors from arbitrarily disregarding its unanimous determination that a sentence of death is justified. See Johnson v. Texas, 509 U.S. 350, 371-72 (1993) (explaining that "'it would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary'") (quoting Saffle v. Parks, 494 U.S. 484, 493 (1990)); Saffle, 494 U.S. at 493 (stating that the government "must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice"). Congress is free to pass a statute which confines arguments of mercy to the jury's consideration of mitigating circumstances and in its final determination of whether the aggravating factors "sufficiently outweigh" the mitigating factors. We also note that Allen was not prohibited from urging the jury to be merciful in its deliberations and in its consideration of asserted mitigating factors. The district court stated as follows:

> There will be no ruling by the Court that mercy is a factor that cannot be considered. Certainly jury nullification cannot be argued nor any argument permitted beyond a statutory scheme. So there's no doubt about it, the defense will not be precluded from arguing that the jury may be merciful in its deliberations.

(Trial Tr., Vol. XIX at 22-23.) For these reasons, we conclude that the instructions given in this case adequately state the law and that the district court did not abuse its discretion by rejecting Allen's proposed mercy instruction.

Pursuant to 18 U.S.C. § 3595(c)(1), we have addressed all of the substantive and procedural issues raised by Billie Jerome Allen's appeal from the sentence of death. We have also considered whether his sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and conclude that it was not so imposed. We further have carefully considered whether the evidence supports the jury's special findings of the existence of the aggravating factors, both statutory and

45

nonstatutory, which the jury found to exist, and we conclude that the evidence is more than sufficient to support the jury's special findings.

## B.  Norris G. Holder
### 1.  Jury Instructions and Specific Intent

Holder argues that jury instructions No. 15 and No. 19 failed to require a finding by the jury that Holder had a specific intent, or <u>mens rea</u>, to kill, and therefore each of his convictions is invalid.  We apply the same standard of review to Holder's instructional error claims as we just applied to Allen's death penalty selection instruction error claim.  <u>See</u> <u>Phelps</u>, 168 F.3d at 1057 (citing <u>Casas</u>, 999 F.2d at 1230).

We turn first to Holder's conviction for bank robbery in which a killing occurs.[15] We agree with the Sixth Circuit that the plain language of 18 U.S.C. § 2113(e) is sufficient to reject Holder's challenge.  "Because the plain language of [18 U.S.C. § 2113(e)] says simply 'kills,' and not 'intentionally kills' or 'murders,' the settled principles of construction direct us to conclude that [Congress] did not intend to add an additional scienter requirement to the killing component of the crime." <u>United States v. Poindexter</u>, 44 F.3d 406, 409 (6th Cir.), <u>cert. denied</u>, 514 U.S. 1132 (1995).  Thus, a conviction under § 2113(e) for armed robbery in which a killing occurs does not require an additional finding of specific intent to kill.  Instead, the statute is like common law felony murder, and we find no error in the district court's instructions to the jury.[16]

---

[15]<u>See</u> 18 U.S.C. § 2113(e) (1994) ("Whoever, in committing any offense defined in this section [bank robbery by force or violence] or in avoiding or attempting to avoid apprehension . . . kills any person . . . shall . . . be punished by death or life imprisonment.").

[16]Instruction No. 15 required a showing that (1) the defendant took money from the bank, (2) by force and violence or intimidation, (3) that the money was federally insured, and (4) that "in committing this offense, the defendant, or a person aided and

Holder's reliance on this court's decision in <u>United States v. Delay</u>, 500 F.2d 1360 (8th Cir. 1974), is misplaced. In <u>Delay</u>, the defendant argued that his conviction under § 2113(e) was invalid because the government had failed to prove specific intent to kill in order to avoid apprehension for bank robbery, but the court found that there was sufficient evidence of that intent. <u>See id.</u> at 1362-64. The real issue presented in <u>Delay</u> was whether there was sufficient evidence to show that the killing was done <u>after</u> committing the bank robbery <u>in order to avoid being apprehended</u>, which was an element of the offense. Although the court assumed for purposes of that appeal that specific intent to kill was actually an element of the crime under § 2113(e), the issue was not before the court and was never actually decided. In any event, <u>Delay</u> does not control the outcome in this case because Holder was convicted of killing while committing the offense, not in an attempt to avoid apprehension. Thus, <u>Delay</u> does not bar us from holding, in accordance with the plain language of the statute and the Sixth Circuit's ruling in <u>Poindexter</u>, that specific intent to kill is not a separate element of the offense under § 2113(e). As in common law felony murder, the intent to kill is supplied by the fact that the killing occurred during the violent commission of the robbery offense itself. <u>See</u> <u>Schad v. United States</u>, 501 U.S. 624, 640 (1991) (noting that "intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought'" at common law).

Next, we turn to Holder's conviction for using a firearm to cause another person's death during a crime of violence.[17] Holder argues that a conviction under 18 U.S.C. § 924(j) requires a jury finding of specific intent to kill. The statute uses the term "murder," rather than "killing," and specifically refers to § 1111 for the definition of

abetted by the defendant, killed Richard Heflin." (Holder's App. at 63).

[17]<u>See</u> 18 U.S.C. § 924(j) (Supp. II 1996) (stating "[a] person who, in the course of a violation of subsection (c) [crime of violence], causes the death of a person through use of a firearm, shall (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life").

murder, which states that "[m]urder is the unlawful killing of a human being with malice aforethought." Thus, a conviction under § 924(j) requires a finding of malice aforethought by the jury. The district court's instruction to the jury required a finding of malice aforethought,[18] but Holder argues that the district court's definition was inadequate. For several reasons, we reject Holder's challenge to the § 924(j) instruction.

First and foremost, the requirement of "malice aforethought" has been satisfied. We agree with the Tenth Circuit's interpretation of § 1111(a) in a case such as this one that "[f]irst degree murder is defined as including any murder which is <u>either</u> premeditated <u>or</u> committed in the perpetration of any of the listed felonies, which include robbery." <u>See</u> <u>United States v. Sides</u>, 944 F.2d 1554, 1557 (10th Cir.), <u>cert. denied</u>, 502 U.S. 989 (1991). Thus, a conviction under § 924(j), pursuant to § 1111(a), is valid under well-established felony murder principles by a finding that the defendant intended to commit the robbery and that a killing occurred in the course of that robbery. <u>See, e.g.</u>, <u>United States v. Pearson</u>, 159 F.3d 480, 485 (10th Cir. 1998) ("[M]alice aforethought is a term of art which has several definitions, including, in the felony murder context, proof of commission of the specified felony. . . . In the typical case of felony murder, there is no malice in fact with respect to the homicide; the malice is supplied by the law.") (internal quotations and citations omitted); <u>United States v. Nguyen</u>, 155 F.3d 1219, 1229 (10th Cir. 1998)("The statute [§ 1111(a)] does not require any proof of intent other than that [d]efendant intended to commit the underlying felony and that the killing was committed in the course of that felony."), <u>cert. denied</u>, 525 U.S. 1167 (1999); <u>United States v. Chischilly</u>, 30 F.3d 1144, 1159-60 (9th Cir. 1994) (noting that a "conviction for felony murder under 18 U.S.C. § 1111

---

[18]<u>See</u> Instruction No. 19, Holder's App. at 65 ("<u>Four</u>, the killing of Richard Heflin was murder in the perpetration of a robbery. Murder is the unlawful killing of a human being with malice aforethought . . . . Killing is done with 'malice aforethought' if it results from the perpetration of a bank robbery in which the defendant was aware of a serious risk of death attending his conduct.").

requires the commission of an enumerated felony with the requisite <u>mens rea</u> for the underlying offense . . . under a felony murder charge the commission of the underlying offense substitutes for malice aforethought"), <u>cert. denied</u>, 513 U.S. 1132 (1995).

Even assuming the felony murder rationale is inadequate by itself to support a conviction under § 924(j), we think the requirement in the instructions that the jury find beyond a reasonable doubt that Holder was aware of a serious risk of death attending the armed robbery is sufficient to uphold the conviction.

We have addressed the issue as follows:

> Malice does not require proof of a subjective intent to kill. Malice may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that <u>defendant was aware of a serious risk of death</u> or serious bodily harm.

<u>United States v. Black Elk</u>, 579 F.2d 49, 51 (8th Cir. 1978) (internal quotations and citations omitted) (emphasis added).

Finally, assuming specific intent is required for a conviction under either § 2113(e) or § 924(j) or both, we find that any error in the district court's instructions was harmless. <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-15 (1999) (holding that failure to submit an element of the offense to the jury is subject to harmless error analysis); <u>id.</u> at 35 ("The failure of the court to instruct the jury properly--whether by omitting an element of the offense or by so misdescribing it that it is effectively removed from the jury's consideration--<u>can</u> be harmless, if the elements of guilt that the jury <u>did</u> find necessarily embraced the one omitted or misdescribed.") (Scalia, J., concurring in part and dissenting in part). We find any error to be harmless because the court's aiding and abetting instructions on each count of conviction supply the necessary specific intent

49

as a matter of law, and in any case the instructions require an explicit finding of specific intent.[19]

Under the aiding and abetting rationale, in other words, Allen's actions "necessarily embraced" the specific intent element. See Nguyen, 155 F.3d at 1226 (finding sufficient evidence to convict defendant of aiding and abetting murder under § 924(j) based solely on the fact that the defendant intended to commit the underlying felony, the victim was killed during the commission of that felony, and the defendant aided and abetted that killing). In the alternative, specific intent can be supplied by a finding that Holder was "aware of a serious risk of death attending his conduct." (Instruction Nos. 16 and 20, supra, n.19.)

_____

[19]Instructions No. 16 and No. 20 provided as follows:

Defendant may also be found guilty of the crime of bank robbery in which a killing occurs as charged in Count I even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of the bank robbery in which a killing occurred. In order to have aided and abetted the commission of this crime defendant must: (1) have known the bank robbery was being committed or going to be committed; and (2) have knowingly and intentionally acted in some way for the purpose of causing, encouraging, or aiding the commission of the bank robbery and in the course of such bank robbery, Richard Heflin was killed; and (3) have been aware of a serious risk of death attending his conduct.

In order to have aided and abetted the commission of this crime defendant must: (1) have known that the offense of using or carrying a firearm during and in relation to a bank robbery was being committed or going to be committed; and (2) have intentionally acted in some way for the purpose of causing, encouraging, or aiding the commission of using or carrying of a firearm during and in relation to a bank robbery and that Richard Heflin was murdered in the perpetration of that robbery; and (3) have been aware of a serious risk of death attending his conduct.

(Holder's App. at 64 and 66, respectively.)

Thus, even if, as Holder argues, the aiding and abetting instructions improperly failed to require a finding that Holder intended to aid and abet each element of the offense, including the fact that a killing took place, we find that the aiding and abetting instructions were adequate. See Nguyen, 155 F.3d at 1226 ("The government did not need to show that [d]efendant had any specific intent to kill . . . the government also presented sufficient evidence that [d]efendant aided and abetted the killing. . . ."). We acknowledge the fact that some courts require a showing that a defendant knowingly and intentionally aided and abetted the commission of the aggravating element of the offense. For example, the Ninth Circuit has held the following:

> To be convicted as an aider and abettor, the defendant must have knowingly and intentionally aided and abetted the principals in each essential element of the crime. . . . To sustain a § 2113(d) conviction for an aider and abettor in this circuit, the government must show that the defendant aided and abetted the principal both in the act of bank robbery and in the principal's use of a dangerous weapon or device during the act.

United States v. Dinkane, 17 F.3d 1192, 1196, 1197 (9th Cir. 1994) (internal quotations omitted). This test would require proof of an intention to kill on the part of an aider and abettor accused of a § 2113(e) violation. Even under the more stringent test adopted by the Ninth Circuit, however, we think the instructions here were adequate because they required a finding that Holder was "aware of a serious risk of death attending his conduct," and as explained below, there is more than sufficient evidence to support this finding.

## 2. Aggravating Factors

Holder challenges the district court's interpretation of, and the constitutionality of, one statutory aggravating factor--"grave risk of death"--and three nonstatutory aggravating factors--"conduct substantially greater in degree than definition of crimes," "future dangerousness," and "other criminal acts." We review challenges to the

51

constitutionality of a particular aggravating factor and the district court's interpretation of a statutory aggravating factor de novo. See Ross v. Ward, 165 F.3d 793, 800 (10th Cir.), cert. denied, 528 U.S. 887 (1999); United States v. Whiting, 165 F.3d 631, 633 (8th Cir. 1999) (reviewing district court's interpretation of federal statutes de novo). For constitutional challenges based on vagueness, however, review is quite deferential because we must rely on the "basic principle that a factor is not unconstitutional if it has some commonsense core of meaning that criminal juries should be capable of understanding." Tuilaepa, 512 U.S. at 973 (internal quotations and alterations omitted). Holder also challenges the sufficiency of the evidence in support of the first two aggravating factors listed above. The standard of review for sufficiency of the evidence is whether, when viewing the evidence and any reasonable inferences therefrom in the light most favorable to the government, a rational trier of fact could have found the aggravating factor beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tipton, 90 F.3d at 896 (applying Jackson standard to aggravating factor insufficiency of the evidence claims); McCullah, 76 F.3d at 1107 (same).

As we have previously explained, there are two different inquiries in the capital decision-making process under the FDPA and the Eighth Amendment: the eligibility decision and the selection decision. See Tuilaepa, 512 U.S. at 971. To be eligible for the death penalty, a trier of fact must find at least one aggravating circumstance, which must be sufficiently narrow that it would not apply to everyone convicted of a murder, and it must not be unconstitutionally vague. Id. at 972. Once a defendant is determined to be eligible for the death penalty, the next consideration is an individualized determination of whether, based on the character of the individual and the circumstances of the crime, the eligible defendant should receive a sentence of death. Id.

We begin with Holder's claim that the "grave risk of death" statutory aggravating factor[20] was unconstitutionally vague and encompassed too large a class of defendants. The district court instructed the jury that "grave risk of death" meant "a significant and considerable possibility under the circumstances that existed at that time that another person could be killed."  (Govt.'s App. at 52-53.)  We find no error in the district court's presentation of this aggravating factor to the jury.  "Possibility" adequately defines "risk" and "significant and considerable" adequately defines "grave" such that the jury was capable of understanding the commonsense core meaning of the statutory aggravating factor.  See Tuilaepa, 512 U.S. at 973.  Thus, there is no constitutional vagueness problem.  Furthermore, we find that this aggravating factor as interpreted by the district court sufficiently narrows the class of defendants eligible for the death penalty.  If no person besides the victim and any codefendants are put at risk of death, or if the risk is not a "significant and considerable possibility," then a defendant would not be eligible for the death penalty.  Thus, this aggravating factor complies with the Eighth Amendment.  See Ross, 165 F.3d at 800 (citing Brecheen v. Reynolds, 41 F.3d 1343, 1360 (10th Cir. 1994)).

We also reject Holder's claims that there is insufficient evidence to support a finding of this factor and that the jury impermissibly relied on an aiding and abetting principle based on Allen's conduct rather than only Holder's conduct to find the existence of this factor.  Our review of the record convinces us that there is sufficient evidence, independent of Allen's actions, for a rational juror to find Holder guilty beyond a reasonable doubt of creating a grave risk of death to one or more persons. Holder was primarily responsible for planning the robbery and was solely responsible for procuring the two semiautomatic rifles, bulletproof vest, and the hollow-point ammunition actually used during the robbery, not to mention the shotgun for use during

---

[20]See 18 U.S.C. § 3592 (c)(5) ("Grave Risk of Death To Additional Persons.-- The defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense.").

the getaway. Even more importantly, the evidence, when viewed in the light most favorable to the government, supports a finding that Holder actually discharged the Russian SKS rifle five times inside the bank during the robbery with numerous bank employees and customers present. (See Trial Tr., Vol. V at 127-47.) Thus, we find sufficient evidence of Holder's conduct to support the jury's finding of this statutory aggravating factor.

We turn then to the first of Holder's challenges to his nonstatutory aggravating factors.[21] The jury found that Holder's "conduct in committing the offense was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors." (Holder's App. at 94.) Holder argues that this factor is unconstitutionally vague. We disagree. The "substantially greater in degree" language, combined with the district court's submission to the jury of the statutory elements of each offense to which Holder was convicted, provided the jury a sufficient common-sense core meaning of the aggravating factor that it was capable of understanding and applying. The relative seriousness of a crime is a factor that is routinely taken into account by sentencing courts. See, e.g., United States Sentencing Guidelines, § 5K2.0 (allowing an upward departure "if the factor is present to a degree

---

[21]Holder challenges two of the nonstatutory aggravating circumstances as being overbroad. Because we have already established the existence of a valid statutory aggravator, making Holder eligible for the death penalty, the nonstatutory aggravators bear only on the individualized selection process. The nonstatutory aggravating factors here clearly directed the jury to the individual circumstances of the case and they therefore do not offend the Constitution on the basis of being overbroad. See Jones, 527 U.S. at 401-02 ("We have not, however, specifically considered what it means for a [nonstatutory] factor to be overbroad when it is important only for selection purposes . . . . So long as [nonstatutory aggravating factors] are used to direct the jury to the individual circumstances of the case . . . we do not think that they [are] overbroad in a way that offend[s] the Constitution.") (Thomas, J., writing for four Justices). We therefore reject Holder's inadequate narrowing challenges to the nonstatutory aggravating factors.

substantially in excess of that which ordinarily is involved in the offense")(emphasis added). We therefore find no vagueness problems with this aggravating factor.

As for the sufficiency of the evidence in support of this factor, our review of the record convinces us that the circumstances of the killing in this case were enough for a jury to find that the conduct of Holder (and his aider and abettor Allen) was substantially greater in degree than the definition of the crime. There were three firearms involved including two semiautomatic rifles; Holder and Allen had approximately two hundred rounds of ammunition, most of which was hollow point ammunition designed to inflict more serious wounds than regular ammunition; sixteen shots were fired inside the bank and at least three bank employees besides Heflin were almost hit; Holder was well aware that security guard Heflin would be at the bank in uniform and carrying a weapon during the time of the armed robbery, and Heflin was shot at least eight times; and two vehicles were stolen for use as getaway vehicles, one of which started on fire while containing live rounds of ammunition. In sum, there is sufficient evidence to support the jury's finding.

Finally we turn to the two remaining nonstatutory aggravating factors--future dangerousness and other criminal acts--challenged by Holder. He asserts that each factor is independently at odds with the FDPA and the Constitution, and that there was insufficient evidence to support a finding of either factor. Holder also argues that, taken together, the factors are duplicative and therefore impermissibly skewed the jury's decision to impose a death sentence.

We begin with the future dangerousness nonstatutory aggravating factor. First, there is little danger of duplication with the statutory aggravating factors because future dangerousness is nowhere mentioned in the list of sixteen statutory aggravating factors for homicide. See FDPA, 18 U.S.C. § 3592 (c) (1994 and Supp. II 1996). Second, given the broad language of the FDPA as to the allowance of nonstatutory aggravating factors, there is no reason under the FDPA why future dangerousness cannot be

55

presented to the jury. See id. § 3592 (c) ("the jury . . . may consider whether any other aggravating factor for which notice has been given exists"). Furthermore, we have little doubt that future dangerousness to society and to prison officials and other inmates during incarceration is relevant to the jury's final determination of whether a death sentence should be imposed. See California v. Ramos, 463 U.S. 992, 1002-03 (1983) (holding that a state may consider and rely upon a defendant's future dangerousness in its decision to seek a death sentence).

Holder's reliance on the Supreme Court's decision in Simmons v. South Carolina is misplaced. See 512 U.S. 154, 178 (1994) (holding that when a state asserts future dangerousness as grounds for imposing a death sentence, due process requires that a defendant be entitled to inform the jury that he is parole ineligible) (O'Connor, J., concurring in judgment). Simmons does not hold that future dangerousness is irrelevant to a jury's final sentencing decision, but rather narrowly holds that the jury must be informed that there is no possibility of parole if future dangerousness is presented as an aggravating factor. The jury in this case was properly informed of Holder's ineligibility for parole. (See Govt.'s App. at 67.) A defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence. The evidence here showed extraordinary planning and little remorse on the part of Holder. Holder argues that the government asserted only that he would be a danger to society but not that he would be a danger in prison. Because the jury was informed of his ineligibility for parole, we find no basis for drawing such a distinction. (See also Trial Tr., Vol. XII at 176 (arguing specifically during closing argument that Holder would be a danger to prison guards).) For these reasons, we find no statutory or constitutional problems with arguing to a capital sentencing jury the nonstatutory aggravating factor of future dangerousness in support of a death sentence.

We turn next to Holder's challenges to the "other criminal acts" nonstatutory aggravating factor. Holder first contends that because six of the sixteen statutory aggravating factors listed in §3592 (c) of the FDPA are based on prior criminal acts, the FDPA precludes using prior criminal acts as a nonstatutory aggravating factor. We disagree. As noted previously, the FDPA specifically allows "any other aggravating factor for which notice has been given." 18 U.S.C. §3592 (c). In addition, the use of criminal history in sentencing has long been an accepted practice, even in the death penalty context. See, e.g., Tuilaepa, 512 U.S. at 976 (upholding use of prior criminal activity sentencing factor); Zant, 462 U.S. at 888 (stating that "[n]othing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination"). "Both a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process . . . ." Tuilaepa, 512 U.S. at 977. Furthermore, Holder points to no authoritative federal precedent in support of his assertion that use of this factor violates the Constitution. In fact, the Supreme Court has noted that sentencing courts have "considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." Nichols v. United States, 511 U.S. 738, 747 (1994) (stating that the Court has upheld the constitutionality of considering unadjudicated criminal behavior in Williams v. New York, 337 U.S. 241 (1949)). See also Hatch v. Oklahoma, 58 F.3d 1447, 1465 (10th Cir. 1995) (noting that although the Court has subsequently called into doubt some of the logic of Williams, the Court has not called into doubt the essence of its holding that unadjudicated crimes may constitutionally be considered in imposing a death sentence), cert. denied, 517 U.S. 1235 (1996); Devier v. Zant, 3 F.3d 1445, 1464-65 (11th Cir. 1993), cert. denied, 513 U.S. 1161 (1995); Williams v. Lynaugh, 814 F.2d 205, 207-08 (5th Cir.), cert. denied, 484 U.S. 935 (1987).

We disagree with Holder's assertion that the Supreme Court's decision in Johnson v. Mississippi, 486 U.S. 578 (1988) controls this issue. In Johnson, the Court reversed a death sentence in which a prior assault conviction was used as an

aggravating circumstance, but crucial to the decision was the fact that the prior conviction for assault had been overturned and no evidence relating to the assault itself had been introduced as evidence in the death sentence case, only the document establishing a conviction, which had been subsequently reversed. Id. at 585. The Supreme Court's decision in Johnson simply does not apply to the situation at hand.

Holder also argues that the other criminal acts factor improperly duplicates the future dangerousness factor. As a general legal proposition, there is strong support for Holder's argument that aggravating factors that duplicate each other can impermissibly skew a jury in favor of imposing a death sentence. See Jones, 132 F.3d at 250-51 ("'double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates a risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally'") (quoting McCullah, 76 F.3d at 1111); Tipton, 90 F.3d at 899 (agreeing with the Tenth Circuit in McCullah that double counting of aggravating factors is constitutional error, but finding that the error was harmless beyond a reasonable doubt). But see Jones, 527 U.S. at 398 ("We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory . . . . What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor.")(Thomas, J., writing for four Justices). We need not reach the legal issue of whether duplication requires reversal of a death sentence, or whether duplication error in this case is harmless, because we find that there is no duplication of aggravating factors in this case. Although some of the evidence of prior criminal conduct can support a finding of future dangerousness, we think the factors themselves and the evidence used to support the finding of each factor in this case were sufficiently different that there is no duplication problem. The prior criminal conduct factor focused on the past and was supported by past criminal acts, while the future dangerousness factor focused on the future and was supported by evidence of Holder's poor performance during probation, his refusal to go through a turnaround program, and his lack of remorse. Under these circumstances, we find no

error in the district court's submission of each of these nonstatutory aggravating factors to the jury.

### 3. Jury Voir Dire

The Sixth Amendment right to a jury trial includes the right to trial by an impartial jury. See Pruett v. Norris, 153 F.3d 579, 584 (8th Cir. 1998). "Our review of whether [a] district judge conducted voir dire in a way that protected [a defendant's] Sixth Amendment right to a fair and impartial jury is limited to an abuse of discretion." United States v. Granados, 117 F.3d 1089, 1092 (8th Cir. 1997) (citing United States v. Spaar, 748 F.2d 1249, 1253 (8th Cir. 1984)). See also United States v. Blum, 65 F.3d 1436, 1442 (8th Cir. 1995) (holding that a district court's refusal to strike jurors for cause should only be reversed if the defendant demonstrates actual prejudice), cert. denied, 516 U.S. 1097 (1996).

On the day the district court began jury selection for Holder's trial, the Allen jury reached a decision as to Allen's sentence. During the lunch recess for Holder's jury selection, the district court received the Allen jury's sentencing decision. Audience members in the Allen courtroom reacted to the verdict with a loud, emotional outburst which included screams and crying. Several members of the Holder venire panel, some of whom were in the hallway outside the Allen courtroom and others of whom were in the nearby Holder courtroom, heard this emotional reaction. The district court was immediately informed of the exposure and took several remedial actions, including general voir dire questions, a general instruction reminding jurors to avoid and disregard anything seen or heard outside the courtroom, and specific individual voir dire questioning about the emotional outbursts. Three jurors and two alternates were ultimately selected from this subpanel. Holder argues that the district court abused its discretion in failing to strike for cause the entire panel and in failing to strike individual jurors who had heard the emotional outbursts.

We find no abuse of discretion in the district court's handling of voir dire with respect to the emotional outburst from the Allen courtroom.

> Whenever it appears during the course of a trial that the members of the jury may have been exposed to publicity which is adverse to the defendant, the trial judge must make an initial determination as to whether the publicity creates a danger of substantial prejudice to the accused. If the trial judge determines that it does, the jurors should then be polled individually to determine whether they have in fact been exposed to the prejudicial information. If any jurors have been so exposed, the trial judge must ascertain the extent and effect of the infection, and what measures, including the possible declaration of a mistrial, must be taken to protect the rights of the accused.

United States v. Dixon, 913 F.2d 1305, 1314 (8th Cir. 1990). To begin with, there was no abuse of discretion in deciding not to strike the entire subpanel. In the circumstances of this case, the emotional outbursts from the nearby courtroom did not present a significant possibility of prejudice to Holder. Nineteen members of the subpanel said they did not hear anything from the nearby courtroom, and of the fourteen subpanel members who said they heard the outbursts, most were not sure what caused the outburst. In other words, it was not clear that the emotional outbursts were caused by the sentence handed down to Allen, as opposed to some other defendant or losing party, and even if some of the subpanel members attributed the reaction to Allen's case, it was not clear whether the reaction was due to the jury's imposition of a death sentence or due to a failure by the jury to impose a death sentence. Thus, the emotional outburst was ambiguous, and combined with the district court's questioning during general voir dire and instructions to disregard anything learned about the Allen verdicts, the district court was well within its discretion in denying Holder's motion to strike the entire subpanel.

We are also convinced that the district court's individual voir dire questioning and procedures were sufficient to uncover any prejudice from the incident. Every

60

subpanel member who was seated as a juror in this case was specifically questioned about the incident out of the presence of the other members. Defense counsel agreed to the questions asked of the subpanel members and had the opportunity to ask follow-up questions, and the district judge excused every juror who knew that Allen had been given a sentence of death. Holder has also fallen short of proving sufficient prejudice or even a sufficient likelihood that the district court's voir dire questioning and procedures were inadequate to discover possible prejudice. Furthermore, even if some of the jurors assumed, based on the emotional outburst, that the death penalty had been imposed on Allen, they are not necessarily automatically disqualified for cause as long as they can lay aside any impressions or opinions and render a verdict based on the evidence presented in court. See Murphy v. Florida, 421 U.S. 794, 799-800 (1975). In sum, the questions posed to Jurors 309 and 322 and others by the district court and the jurors' replies to those questions convince us that Holder has failed to show either any actual prejudice or insufficient voir dire procedures. We are therefore confident that Holder was convicted and sentenced by a jury that met the fairness and impartiality standards required under the Sixth Amendment.

Holder also argues that the district court abused its discretion in failing to strike for cause a subpanel of twenty jurors who were exposed to Juror 310's comments regarding the inadequacy of life in prison as punishment. The following exchange occurred during voir dire:

> Defense Counsel: Are there any of you who do not believe that a life imprisonment without the possibility of release sentence is punishment? You probably all heard people say, "Prison's too good for him. It's not punishment." Anyone feel that way? Sending someone to prison for the rest of his life is not punishment? Yes, sir. 310?
> Juror 310: 310. Having been in many of these institutions for work --
> Defense Counsel: Clarify that.
> Juror [310]: I talked to the guards. And the guards say, ["]You know, these guys got it made. They've got paid cable TV, and the wors[t] that they can do -- ["]

61

(Trial Tr., Mar. 13, 1998, at 101-02.)  Juror 310 was cut off at that point by the district judge and a sidebar conference was held.  The district judge denied defense counsel's motion that the entire subpanel be discharged, and suggested that any further questions for Juror 310 on this issue be asked outside the presence of the other jurors.  Defense counsel insisted that further questioning in front of the entire subpanel was necessary to minimize possible prejudice to the other jurors by discrediting the basis for Juror 310's statement.  The following exchange then occurred:

> Defense Counsel:  You told us, sir, that, as part of your employment . . . sometimes you're called to go into penitentiaries and assist inmates with their health concerns?
> Juror 310:  About three times a month and in several prisons and jails throughout the United States, yes.
> Defense Counsel:  And you said about three times a month?
> Juror 310:  Three times, yeah.  I travel about two, three days a week; three times a month.
> Defense Counsel:  Okay.  Let me just ask –
> Juror 310:  We provide health care to those inmates.  Yes.
> Defense Counsel:  Have you been in every prison across the United States?
> Juror 310:  No.  Just probably about 100 or so.
> Defense Counsel:  Have you had an opportunity yourself to observe the conditions and day-to-day living in the cells and modules of the inmates?
> Juror 310:  Yes, I have.
> Defense Counsel:  And your conclusions on what you have heard has been from other guards that you've talked to at the prison?
> Juror 310: Oh, no.  There's things that I see.  And I realize that somebody who is, let's say –
> Court: Wait a minute.  Let's end it there.  If you want to talk privately, we will [take] it up.

(Id. at 103-04.)  Of the twenty potential jurors on the subpanel who heard these comments, eight ultimately sat on Holder's jury.  Juror 310 was later struck for cause

and did not sit on the jury.  Holder argues that all twenty of the potential jurors should have been dismissed for cause.

We find no abuse of discretion in the district court's refusal to strike the entire subpanel of jurors after hearing the above comments by Juror 310.  Initially, the district court properly cut short Juror 310's comments, at which point the only comment subpanel members had heard was that some prisoners have free cable television.  Given that an average juror has likely already heard statements like this before outside the courtroom, and given that every other juror indicated by their silence that life in prison did constitute punishment, the potential prejudice to Holder based on this lone comment is so attenuated that there is no doubt that the district court did not abuse its discretion in rejecting Holder's request to dismiss the entire subpanel.  The additional questioning by Holder's own attorney may have backfired, as it may have strengthened Juror 310's credibility by showing the substantial personal experience which formed the basis of his opinions, but these additional statements do not come close to establishing a basis for sufficient prejudice to demonstrate an abuse of discretion by the district court.  We therefore conclude that the district court did not abuse its discretion with respect to any of its voir dire decisions.

4. Autopsy Photographs

Holder challenges the admissibility of four graphic autopsy photographs.  With respect to autopsy photographs under Federal Rule of Evidence 403,

> [a] trial court has discretion to admit a relevant photograph unless it is so gruesome or inflammatory that its prejudicial impact substantially outweighs its probative value.  A district court has broad discretion when ruling on the admissibility of evidence.  We will not reverse the district court's decision regarding the admissibility of evidence absent a clear abuse of discretion.

United States v. Hester, 140 F.3d 753, 759 (8th Cir. 1998) (internal quotations and citations omitted).

As required by Rule 403, the district court weighed the probative value of the victim autopsy photographs against the possibility of unfair prejudice to Holder. The district court performed a separate Rule 403 analysis for each of the four challenged photographs as they were entered into evidence and found that the probative value of each photograph outweighed any danger of unfair prejudice. The district court specifically found that the photographs were needed to refresh the recollection of the medical examiner as he testified; that the one-dimensional diagram was not adequate to show the trajectory of the bullets, the exact location of entry and exit wounds, or the extent of the injuries; that not admitting the photographs would confuse the jury; and that the photographs were not a waste of time or a needless presentation of cumulative evidence.

Having examined the photographs, we agree with the district court that the autopsy photographs had substantial probative value because they showed the entry angles of the bullets, the locations of each wound, and the extent of the injuries caused by the hollow point bullets. The photographs were therefore an important aid to the witness and the jury in determining the relative positions of the victim and the shooters as each shot was fired, which was a key issue during the trial directly impacting on the culpability of each defendant. The photographs were also probative of intent--another aspect of each defendant's culpability--by showing the extent of damage caused by the choice of using hollow point ammunition during the robbery. The probative value of these photographs is confirmed by the fact that the jury specifically requested the photographs during its sentencing deliberations. Moreover, the autopsy photographs, which depict each individual wound rather than the entire body of the victim, are not unfairly prejudicial. As this court explained in United States v. Davidson, "[t]hough graphic, the autopsy photographs were less gruesome than [] crime scene photos, and they helped explain the testimony of [the doctor] who performed the autopsy." 122 F.3d

531, 538 (8th Cir. 1997), cert. denied, 522 U.S. 1034 (1997), and 523 U.S. 1033 (1998). For these reasons, in addition to the reasons set forth by the district court, we find no abuse of discretion, let alone any clear abuse of discretion, in the district court's decision to admit the four autopsy photographs showing the victim's gunshot wounds.

### 5. Restitution

Finally, Holder argues that the district court erred as a matter of law by holding that proceeds from his settlement from a past lawsuit could be garnished in order to satisfy the court's judgment that restitution be paid to the family of Mr. Heflin, Lindell Bank &Trust, and other victims. Holder asserts that state law, not federal law, determines whether property can be attached, and that Missouri law is clear that the terms of a settlement contract determine whether that settlement can be attached by creditors. The government counters that this court is without jurisdiction to hear Holder's challenges to the restitution order because Holder waived his right to appeal by failing to participate in the restitution phase of his sentencing, by failing to file a separate notice of appeal from the restitution order, and because the restitution order is an independent civil matter that is not part of the criminal proceedings against Holder. The government also argues that the district court's decision was correct on the merits because although state law determines whether a property interest exists, federal law determines whether and how that property interest can be attached.

First, we agree with Holder that this court has jurisdiction to hear this challenge to the district court's restitution order. The restitution order is a criminal monetary penalty which is part of the criminal proceeding against Holder, and thus is not a parallel civil action. See 18 U.S.C. §§ 3556, 3663, 3663A, and 3664 (Supp. II 1996). Second, the notice of appeal challenging Holder's conviction and sentence did not divest the district court of jurisdiction to clarify its restitution order as additional information was discovered, and thus Holder need not file a separate appeal from the clarified restitution order. Third, the government does not cite any persuasive authority

65

in support of its claim that Holder's failure to participate in the restitution phase of his sentencing amounts to a waiver of his right to contest the legality of the court's final restitution judgment. For these reasons, we have jurisdiction to address the merits of Holder's challenge to the court's restitution order.

In these circumstances, we think the legal principles are clear that state law determines whether a property interest exists in the first instance, but federal law determines whether and how that property may be attached. "Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the federal tax lien provision, state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States." Drye v. United States, 528 U.S. 49, 52 (1999) (citing United States v. Bess, 357 U.S. 51, 56-57 (1958)); see id. at 61 (holding that the right to disclaim property under state law does not defeat a federal tax lien because the taxpayer exercised control over the disposition of the property). There is little doubt under Missouri law that Holder has a property interest--in fact, the sole property interest--in the remaining proceeds from the settlement. Thus, federal law determines whether that property can now be attached to satisfy a federal order for restitution, and it is clear from the statutory provisions cited by the district court that Holder's settlement proceeds can be attached. See 18 U.S.C. § 3664(n) (Supp. II, 1996) (stating that a person ordered to pay restitution shall be required to apply the value of any "inheritance, settlement, or other judgment" to any restitution still owed); 18 U.S.C. § 3613(c) (Supp. II, 1996) (treating an order of restitution under § 3664 as if it were a tax lien enforceable under the Internal Revenue Code). Holder had a property interest in the settlement proceeds under state law, the property can be attached by a federal tax lien, and thus we find no error in the district court's order garnishing Holder's settlement proceeds in order to pay restitution to the victims.

Pursuant to 18 U.S.C. § 3595(c)(1), we have addressed all of the substantive

66

and procedural issues raised by Norris G. Holder's appeal from the sentences of death. We have also considered whether his sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor and conclude that they were not so imposed. We further have carefully considered whether the evidence supports the jury's special findings of the existence of the aggravating factors, both statutory and nonstatutory, which the jury found to exist, and we conclude that the evidence is more than sufficient to support the jury's special findings.

## III. Conclusion

For the foregoing reasons, Billie Jerome Allen's conviction and life sentence for violating 18 U.S.C. § 2113(e) and his conviction and sentence of death for violating 18 U.S.C. § 924(j)(1) are hereby affirmed, and Norris G. Holder's convictions and sentences of death for violating both 18 U.S.C. § 2113(e) and 18 U.S.C. § 924(j)(1), as well as the district court's order requiring Holder to pay restitution to the victims, are also affirmed.

The judgments of the district court are affirmed.

RICHARD S. ARNOLD, Circuit Judge, dissenting.

I respectfully dissent.

## A.

I believe Mr. Allen's confession is inadmissible. The facts are undisputed. Mr. Allen was arrested at approximately 2:00 a.m. on a Tuesday and brought to a police interrogation room. At approximately 4:00 a.m., he requested the appointment of counsel. Questioning stopped, but no attempts were made at that point to secure counsel. Given the hour, I cannot say that this was unreasonable.

67

Mr. Allen was kept in the interrogation room handcuffed to a table for the remainder of the early morning. At approximately 8:00 a.m., the police asked Mr. Allen if, in light of his request for counsel, he was still willing to provide blood, hair, and saliva samples, as he had previously indicated he would, and he agreed. By 9:00 a.m., or certainly by 10:00 a.m., it should have been feasible to take the steps necessary to honor Mr. Allen's request for counsel. This was not done.

Instead, at approximately 10:10 a.m., the police approached Mr. Allen again and asked him to participate in a lineup. The police reminded Mr. Allen of his previous request for counsel. Mr. Allen agreed to participate in the lineup without the presence of counsel. After the lineup, the police informed Mr. Allen that three out of four witnesses had placed him at the scene of the crime. Mr. Allen then stated that he wanted to talk to a police officer he knew, even though counsel had not been obtained. Mr. Allen then proceeded to confess to this police officer.

These facts can lead to only one conclusion: Mr. Allen's request for counsel was not honored. As the Court explains, once an individual expresses a desire to deal with the police only through counsel, the police may not further interrogate the defendant "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). The purpose of this "stringent" rule is to ensure that officials "scrupulously honor" the right of an accused in custody, who has requested the assistance of counsel, to have all interrogation cease until an attorney is present. James v. Arizona, 469 U.S. 990, 992 (1984) (Brennan, J., dissenting from denial of certiorari).

Interrogation in this context includes "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the defendant." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). If, after the right to counsel has been invoked, the police

68

do "initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).

I agree with the proposition for which the Court cites United States v. Payne, 954 F.2d 199, 203 (8th Cir. 1992): After a suspect has invoked his right to counsel, not all statements by the police regarding the nature of the evidence against him constitute a forbidden interrogation as a matter of law. Rather, the circumstances of each case must be examined. In Payne, for example, the suspect told the arresting agents that he wished to consult with counsel. He spoke with his attorney by telephone, and told the agents he would consult with counsel in person before speaking with them. When processing was complete, he was transported by car to another location. During the ride, an agent in the car received a call that a handgun had been found at the suspect's residence. The agent told this to the suspect, who then stated that he had the gun for protection. Noting that Mr. Payne was not subjected to "compelling influences, psychological ploys, or direct questioning," the Court held that the suspect's statement was admissible.

The situation in the present case is different. Mr. Allen's request for counsel was ignored beyond the time of day when it was feasible to secure counsel for him. The police reinitiated contact with Mr. Allen several times before any attempt was made to honor his request for counsel. The request that he participate in a lineup and the statement that three out of four witnesses had identified him occurred after Mr. Allen had been chained to a table in the interrogation room for seven hours - and five hours after he asked for counsel. It seems apparent that the police were hoping Mr. Allen would weaken, which is exactly what occurred.

The Court focuses its inquiry on whether the statement by the police to Mr. Allen that witnesses had identified him in the lineup constituted an "interrogation." The Court makes no mention in its analysis of the request by the police that Mr. Allen participate in a lineup without the presence of counsel. As stated above, this request was initiated by the police hours after Mr. Allen had requested counsel. I believe it is clear that this request was impermissible under Edwards. Cf. Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (suggestion by police that suspect take a polygraph examination and statement by examiner that he did not believe suspect did not violate Edwards because suspect, and not the police, had initiated further conversation about the investigation after he had requested counsel).

The two cases from our Circuit relied upon by the Court, United States v. Williams, 136 F.3d 547 (8th Cir. 1998), and Holman v. Kemna, 212 F.3d 413 (8th Cir. 2000), offer no support for its position, and actually undermine it. In Williams, the Court assumed that an officer's statement that the defendant had been identified in a lineup was an "interrogation." However, because the defendant had not previously asserted any of his Miranda rights, his statement after this "interrogation" that he wanted to talk was not coerced, and his subsequent statements were admissible. 136 F.3d at 553. Here there is no dispute that Mr. Allen had invoked his right to counsel.

In Holman, we also assumed that a police officer's visit to the defendant's cell without contacting the defendant's attorney, to inform the defendant that his girlfriend had confessed, would be an improper custodial interrogation. The defendant's confession obtained the next day, however, was held to be admissible because of the lapse in time from the impermissible interrogation to the confession. During this time, the defendant had a chance to speak to his stepfather who urged him to wait until his attorney could be contacted and to sleep on it. 212 F.3d at 417-20. Even under those facts, the Court found the question to be close, and one of the Judges dissented. Id. at

70

421-22. Here, of course, there was no lapse of time between the police telling Mr. Allen that he had been identified in the lineup and his confession.

Mr. Allen's right to counsel was not "scrupulously honored." His confession was tainted by unconstitutional conduct and was inadmissible. Although other evidence linked Mr. Allen to the crime, the admission of his confession was not harmless beyond a reasonable doubt. Accordingly, he is entitled to a new trial. I would reverse.

B.

I also dissent with regard to Mr. Holder's convictions and sentences. I believe that the Court errs in its conclusion with regard to the jury instructions on Count I, charging a violation of 18 U.S.C. § 2113(e). This section provides, "[w]hoever, in committing [a bank robbery] . . . kills a person . . . shall . . . be punished by death or life imprisonment." Under the instructions in Mr. Holder's case, the jury was permitted to find him guilty not just as a principal, but also as an aider and abettor. The Court holds that a conviction as an aider and abettor under this statute does not require a finding of specific intent to aid and abet the killing, but only of specific intent to aid and abet the robbery. Ante at 47.

I believe the position taken by the Ninth Circuit on this issue is the correct one. An accomplice charged under § 2113(e) must aid and abet the principal both in the bank robbery and in the killing. "It is not enough for the jury to find that the defendant aided and abetted a bank robbery in which a killing occurred." United States v. Jones, 678 F.2d 102, 106 (9th Cir. 1982); United States v. Dinkane, 17 F.3d 1192, 1197 (9th Cir. 1994) (same reasoning applied to § 2113(d) - armed assault during commission of a bank robbery); United States v. Short, 493 F.2d 1170, 1172 (9th Cir. 1974) (same); see also United States v. Longoria, 569 F.2d 422, 425 (5th Cir. 1978) (quoting United

States v. Short with approval and applying it to a charge of aiding and abetting the possession of drugs with the intent to distribute).

This position is strengthened by Jones v. United States, 119 S. Ct. 1215, 1220-21 (1999), which establishes beyond argument that the relevant factor in § 2113(e) of a killing is an essential element of the offense of which Mr. Holder was convicted. Our own Model Criminal Jury Instructions also support Mr. Holder's argument. The model instruction for bank robbery in violation of 18 U.S.C. § 2113(d), which is comparable to § 2113(e) except that it applies to an armed assault during the robbery rather than a killing, lists the assault as a separate element of the offense which the defendant must commit. I believe the clear implication is that intent is required for this element as well as for the first element - the robbery.

Because this is a death-penalty case, other, even more compelling, principles mandate that Mr. Holder's sentences on both Counts I and II must be reversed. Before a defendant can be sentenced to death, the Eighth Amendment requires that he be guilty of a certain degree of culpable conduct. Fairchild v. Norris, 21 F.3d 799, 802 (8th Cir. 1994). In the context of felony murder, the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the . . . culpability requirement." Tison v. Arizona, 481 U.S. 137, 158 (1987).

The jury instructions in Mr. Holder's case fall short of this standard. The instructions on Count I did not require the finding of any mental state with regard to the killing. With regard to Count II, the jury was instructed that "[k]illing is done with 'malice aforethought' if it results from the perpetration of a bank robbery in which the defendant was aware of the serious risk of death attending his conduct." "Aware of serious risk of death" is a less stringent standard than "reckless indifference to human life." Being aware of a serious risk attending one's conduct is gross negligence at best. We know that gross negligence does not rise to the level of reckless disregard or

indifference in tort law.   See <u>Hunter v. Namanny</u>  219 F.3d 825, 833 (8th Cir. 2000). These standards should certainly not be seen as equivalent in the context of death-penalty jurisprudence.  Accordingly, I would reverse and remand with directions that Mr. Holder's death sentence be changed to life in prison without parole.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.